UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X
                     :

PAUL BARBARA, DIANE KENNEY, ANGELA      :     12-CV-0368 (ARR)
CHIANESE, and MATTHEW BARBARA,        :

           Plaintiffs,            :     OPINION AND ORDER

      -against-                 :

MARINEMAX, INC., WILLIAM H. MCGILL, JR.,   :
MICHAEL H. MCLAMB, MICHAEL AIELLO, and   :
ROBERT S. KANT,                    :

           Defendants.          :

---------------------------------------------------------------------- X

ROSS, United States District Judge:

      This case arises from plaintiffs' sale of a boat business to defendants for cash and stock.

The parties' dispute revolves around defendants' alleged refusal to remove a restrictive legend

from the stock certificates, resulting in a long delay before plaintiffs could sell the stock and thus

realize the value of the sale. According to plaintiffs, by the time the restrictive legends were

finally lifted, the stock value had gone down substantially, due at least in part to the actions of the

defendant corporate officers. Plaintiffs allege numerous claims against defendants, including

breach of contract, breach of fiduciary duty, violations of the Delaware Uniform Commercial

Code and the federal Securities Exchange Act §10(b), unjust enrichment, tortious interference,

and fraud. Defendants move to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules

of Civil Procedure. For the reasons stated below, the motion is granted in part and denied in part.

# BACKGROUND

I.    *Plaintiffs contract to sell their boat business to MarineMax*

Plaintiffs are siblings. Am. Compl. ¶ 16, Dkt. #2. Together, they owned a boat business, Surfside-3 Marina, Inc., and affiliated companies. Id. On or about March 30, 2006, they entered into a contract with MarineMax, Inc. ("MarineMax"), a recreational boat and yacht retailer incorporated in Delaware. Am. Compl. ¶¶ 11, 18. The contract, known as the Asset Purchase Agreement ("APA"), effected a sale of the Surfside-3 Marina business to MarineMax for $45 million. Am. Compl. ¶ 19. The purchase price was to be paid 55% in cash and 45% in MarineMax common stock. Id. The APA required that the stock to be transferred as part of the purchase price would be "restricted securities" as defined under Rule 144 of the Securities Act. Am. Compl. ¶ 20; APA § 4.1(w)(iii).[1] This meant that the stock could not be resold to the public unless it was registered with the U.S. Securities and Exchange Commission ("SEC") or was exempt from registration requirements. Am. Compl. ¶ 21. The certificates representing the stock contained a legend stating this restriction. APA § 4.1(w)(iii); see Defs.' Mot. to Dismiss, Ex. B. Rule 144 of the Securities Act requires a holding period for restricted securities. 17 C.F.R. § 230.144(d). The "general rule" under the Securities Act is that the holding period shall be six months if the issuer of the securities is subject to certain reporting requirements and one year if the issuer is not subject to such reporting requirements. Id. § 230.144(d)(1)(i)-(ii). Though the APA does not specify, it is undisputed that the one-year holding period applied in this case. Am.

---

[1]Because the APA is referenced throughout, and is integral to, the Amended Complaint, it may be considered in deciding defendants' motion to dismiss, without converting the proceeding to one for summary judgment. Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995).

Compl. ¶ 20. Therefore, according to plaintiffs, "[o]n or about April 1, 2007, the restrictions on the stock could have and should have been lifted." Am. Compl. ¶ 39.

## II. *Plaintiffs attempt to sell the stock prior to April 1, 2007*

Before the end of the holding period, plaintiffs attempted to sell the restricted stock to Bear Stearns in an effort to hedge against the decline of the stock value during the holding period. Am. Compl. ¶ 26. On or about December 26, 2006, a representative of Bear Stearns contacted defendant Robert S. Kant ("Kant"), who was MarineMax's outside general counsel as well as a member of the MarineMax Board of Directors. Am. Compl. ¶¶ 15, 28. Kant declined to approve the sale, however, informing Bear Stearns in a communication dated December 26, 2006, that "Bear Stearns would have to inform our firm and MarineMax that it has taken whatever steps it deems appropriate to assure itself that none of the sellers is in possession of material non-public information regarding MarineMax." Am. Compl. ¶ 29. The next day, Bear Stearns' representative reported to Kant that none of the plaintiffs had access to any material non-public information, but Kant never responded to this communication. Am. Compl. ¶¶ 30-31. The sale to Bear Stearns apparently never went through.

## III. *Plaintiffs attempt to lift the stock restrictions*

Plaintiffs allege that "for several months leading up to April 1, 2007, [plaintiffs and their representatives] communicated with MarineMax representatives to assure that all the necessary steps had been or would be taken to lift the restrictions immediately on April 1, 2007." Am. Compl. ¶ 40. They also contacted Kant "on several occasions . . . , requesting an opinion letter to lift the MarineMax stock restrictions," but "Kant ignored numerous communications to him." Am. Compl. ¶ 42. Plaintiffs also allege that defendant William McGill, Jr. ("McGill"), chairman

of the board of MarineMax and its president and chief executive officer, "was advised about Kant's refusal to issue the required opinion letter and Kant's wanton refusal to respond to communications directed at having the restrictions lifted." Am. Compl. ¶ 43. McGill, however, also "ignored this information and refused to assist" plaintiffs. Id.

During this time, plaintiffs allege that McGill and other corporate officers of MarineMax named as defendants, Michael H. McLamb ("McLamb") and Michael Aiello ("Aiello"), engaged in "insider sales" of their own MarineMax shares. Am. Compl. ¶¶ 44-45. McGill sold 350,000 shares between May 22, 2007, and June 18, 2007, for a total of $7,475,430. Am. Compl. ¶ 44(a). McLamb sold 65,000 shares between November 28, 2007, and December 21, 2007, for a total of $1,024,712. Am. Compl. ¶ 44(b). Aiello sold 4,000 shares on May 22, 2007, for a total of $83,738. Am. Compl. ¶ 44(c). Plaintiffs suggest that these insider sales caused the stock price of MarineMax to fall "dramatically," leading plaintiffs to "abandon[] their efforts to sell" the stock. Am. Compl. ¶ 45.

IV.    *The stock restriction is lifted and plaintiffs commence suit*

On August 12, 2009, Kant issued an opinion letter stating that "the restrictive legend may be removed from the certificates evidencing the Shares." Am. Compl. ¶¶ 46-47. The stock restrictions were then lifted on August 17, 2009. Am. Compl. ¶ 48. By that time, however, MarineMax stock was trading at approximately $7.45 per share, down from approximately $23.00 on April 1, 2007, when plaintiffs say the restriction should have been lifted. Am. Compl. ¶ 49. Plaintiffs commenced this action on January 26, 2012, Dkt. #1, and amended the Complaint on February 8, 2012, Dkt. #2. The Amended Complaint lists twelve claims for relief, Am. Compl. ¶¶ 50-139:

1. Violation of Delaware Uniform Commercial Code § 8-401 by MarineMax

2. Breach of Fiduciary Duty against McGill, McLamb, Aiello, and Kant for refusing to permit the stock sale to Bear Stearns

3. Breach of Fiduciary Duty against McGill, McLamb, Aiello, and Kant for failure to lift the stock restrictions

4. Breach of Fiduciary Duty against McGill, McLamb, and Aiello for their alleged "insider sales" of MarineMax stock

5. Aiding and Abetting Breach of Fiduciary Duty by Kant

6. Unjust Enrichment by McGill, McLamb, and Aiello

7. Breach of Contract by MarineMax for refusal to permit the stock sale to Bear Stearns

8. Breach of Contract by MarineMax for failure to lift the stock restrictions

9. Tortious Interference with Contractual Relations by McGill, McLamb, Aiello, and Kant for refusal to permit the stock sale to Bear Stearns

10. Tortious Interference with Contractual Relations by McGill, McLamb, Aiello, and Kant for failure to lift the stock restrictions

11. Violation of the Securities Exchange Act § 10(b)

12. Common Law Fraud

Plaintiffs seek compensatory damages for the lost value of their stock, along with consequential and incidental damages, as well as punitive damages. Am. Compl. ¶¶ 140-41. Defendants now move to dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, see Defs.' Mot. to Dismiss, Dkt. #22; Defs.' Mem. in Supp. of Mot. to Dismiss, Dkt. #24 [hereinafter "Defs.' Supp. Mem."].

# DISCUSSION

I.   *Standard of Review*

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); Freedom Holdings, Inc. v. Spitzer, 363 F.3d 149, 151 (2d Cir. 2004). The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Only a "plausible claim for relief survives a motion to dismiss." LaFaro v. New York Cardiothoracic Group, PLLC, 570 F.3d 471, 476 (2d Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). However, courts are "not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1949-50 (citation and internal quotation marks omitted).

Under Rule 9(b), "a party [alleging fraud or mistake] must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. Proc. 9(b). To survive a motion to dismiss under this heightened standard, a complaint alleging fraud must "allege facts that give rise to a strong inference of fraudulent intent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). An inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by

6

alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. "[M]ere general allegations that there was fraud, corruption or conspiracy or characterizations of acts or conduct in these terms are not enough [to survive a Rule 9(b) motion] no matter how frequently repeated." Segal v. Gordon, 467 F.2d 602, 607 (2d Cir. 1972) (internal quotation marks omitted).

II.    *Plaintiffs' Claims*

Plaintiffs' approach to this litigation consists of alleging multiple overlapping and intertwined causes of action for what ultimately boils down to two objectionable acts by defendants: (1) that defendants refused to permit plaintiffs to sell their restricted stock to Bear Stearns prior to the end of the one-year holding period; and (2) that defendants failed to lift the stock restrictions when they should have been lifted. Although the deficiencies of most of plaintiffs' claims will come to light best upon concrete examination of the claims and the corresponding grounds for dismissal, it is worth first addressing the issue of the stock sale to Bear Stearns, since doing so will have substantial downstream effects on the rest of the issues in the case.

Plaintiffs allege that "[a]s part of a strategy to hedge against a decline in the MarineMax stock pending expiration of the one-year public trading restriction period, [plaintiffs] planned to engage in a private sale of the restricted stock with Bear Stearns pursuant to Rule 144A of the Securities Act." Am. Compl. ¶ 26. The problem with this strategy is that it was prohibited by law. Rule 144A permits the private resale of securities to institutions only when the securities offered or sold "[w]ere not, when issued, of the same class as securities listed on a national securities exchange." 17 C.F.R. § 230.144A(d)(3)(i). Defendants argue that plaintiffs'

securities were MarineMax common stock, which is traded on the New York Stock Exchange, and therefore could not be resold. Defs.' Supp. Mem. 10, n.7, 24, n.13. The Amended Complaint itself states that MarineMax was listed on the New York Stock Exchange, Am. Compl. ¶ 11, and makes clear that 45% of the sale was to be paid in MarineMax common stock "valued based on the average closing price of MarineMax common stock during the 10-day period ending 10 days prior to the Closing Date or $30.45, whichever is lower," id. ¶ 19 (internal quotation marks omitted). Plaintiffs nowhere allege that there were multiple classes of MarineMax common stock.

In addition, I take judicial notice of MarineMax's public filings with the SEC, available online in the EDGAR database. See Coleman & Co. Sec., Inc. v. Giaquinto Family Trust, 236 F. Supp. 2d 288, 308-09 (S.D.N.Y. 2002) (taking judicial notice of public filings in SEC EDGAR database). MarineMax's annual and quarterly reports from the period during which plaintiffs attempted to sell their restricted stock to Bear Stearns indicate a single class of common stock. See, e.g., MarineMax, Inc., Annual Report (Form 10-K) (Dec. 11, 2007); MarineMax, Inc., Quarterly Report 4 (Form 10-Q) (Jan. 31, 2007). It is clear from the Amended Complaint and the publicly available filings that plaintiffs' stock was "of the same class as securities listed on a national securities exchange[,]" "when issued." 17 C.F.R. § 230.144A(d)(3)(i). A private resale of plaintiffs' MarineMax stock to Bear Stearns was therefore barred by Rule 144A.

As a result, plaintiffs' claims for relief based on the attempted stock sale are untenable. Plaintiffs' second cause of action, for Breach of Fiduciary Duty against McGill, McLamb, Aiello, and Kant for refusing to permit the stock sale, is preempted. See Chanoff v. U.S. Surgical Corp., 857 F. Supp. 1011, 1015 (D. Conn. 1994) (noting, in context of federal securities laws,

"preemption is compelled where states require behavior prohibited by federal enactments")
(internal quotation marks omitted). Plaintiffs' seventh cause of action, for Breach of Contract
against MarineMax for refusal to permit the stock sale, is barred because even if there were an
express provision in the APA authorizing the stock sale (which there is not), that provision
would be unenforceable. See Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838, 843 (2d Cir.
1952) ("[I]t is clear that a contract which violates the laws of the United States and contravenes
the public policy as expressed in those laws is unenforceable."). Finally, plaintiffs' ninth cause
of action, for Tortious Interference in Contractual Relations, is barred because there can be no
breach of contract upon which to premise tortious interference. See Nelly de Vuyst, USA, Inc. v.
Europe Cosmetqiues, Inc., No. 11 CV 1491(VB), 2012 WL 246673, at *6 (S.D.N.Y. Jan. 6,
2012) (breach of contract is "an essential element" of a tortious inference claim).

 Accordingly, I dismiss plaintiffs' second, seventh, and ninth causes of action, because all
stem from defendants' alleged refusal to permit the private stock sale to Bear Stearns.  I now turn
to their other claims and discuss each sequentially:

 (a) Violation of Delaware Uniform Commercial Code § 8-401 (first cause of action)

Delaware U.C.C. § 8-401 provides:

(a) If a certificated security in registered form is presented to an issuer with a
request to register transfer or an instruction is presented to an issuer with a request
to register transfer of an uncertificated security, the issuer shall register the
transfer as requested if:

> (1) under the terms of the security the person seeking registration
> of transfer is eligible to have the security registered in its name;

> (2) the endorsement or instruction is made by the appropriate
> person or by an agent who has actual authority to act on behalf of
> the appropriate person;

(3) reasonable assurance is given that the endorsement or instruction is genuine and authorized (Section 8-402);

(4) any applicable law relating to the collection of taxes has been complied with;

(5) the transfer does not violate any restriction on transfer imposed by the issuer in accordance with Section 8-204;

(6) a demand that the issuer not register transfer has not become effective under Section 8-403, or the issuer has complied with Section 8-403(b) but no legal process or indemnity bond is obtained as provided in Section 8-403(d); and

(7) the transfer is in fact rightful or is to a protected purchaser.

(b) If an issuer is under a duty to register a transfer of a security, the issuer is liable to a person presenting a certificated security or an instruction for registration or to the person's principal for loss resulting from unreasonable delay in registration or failure or refusal to register the transfer.

Del. Code Ann. tit. 6, § 8-401.

Plaintiffs allege in their first cause of action that "as of April 1, 2007, [they] had met all the requirements necessary to have the Rule 144 restrictive legend removed from their common stock." Am. Compl. ¶ 53. Therefore, they argue, defendants had a duty under the statute to register a transfer of the stock upon request and are liable for loss resulting from unreasonable delay. Am. Compl. ¶ 55. Defendants contend (1) that plaintiffs' claim is barred by the statute of limitations,[2] and (2) that plaintiffs did not meet all the statutory preconditions, because they did not demonstrate that "the transfer [was] in fact rightful," Del. Code Ann. tit. 6, § 8-401(a)(7). See Defs.' Supp. Mem. 6-11.

---

[2] Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss. Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir. 1989)

(1)   *Statute of Limitations*

Delaware law provides that "no action based on a statute . . . shall be brought after the expiration of 3 years from the accruing of the cause of such action." Del. Code Ann. tit. 10, § 8106. The question, then, is when the cause of action accrued. Defendants argue the cause of action accrued on April 1, 2007, the date on which, in plaintiffs' words, "the restrictions on the stock could have and should have been lifted," Am. Compl. ¶ 39. See Defs.' Supp. Mem. 8. Plaintiffs counter that the claim for relief accrued "on August 17, 2009, when the restrictions were finally lifted." Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, Dkt. #25, at 9 [hereinafter "Pls.' Opp'n Mem."].

Under Delaware law, "[a] cause of action accrues at the moment of the wrongful act." Fike v. Ruger, 754 A.2d 254, 260 (Del. Ch. 1999). Section 8-401 permits two separate and mutually exclusive remedies for the wrongful refusal to transfer stock: "The aggrieved stockholder may bring an action in law or equity - but not both." Loretto Literary & Benevolent Inst. v. Blue Diamond Coal Co., 444 A.2d 256, 259 (Del. Ch. 1982). "In a suit in equity, a plaintiff may seek injunctive relief in order to compel recordation." Id. Alternatively, "in a suit at law, . . . a plaintiff may recover the market value of the shares at the date of refusal to record the transfer just as in the ordinary case of conversion." Id. (emphasis added). In Mastellone v. Argo Oil Corp., 82 A.2d 379 (Del. 1951), addressing an argument that a cause of action for conversion of stock began to run only when the plaintiff knew of the commission of the tort, the Delaware Supreme Court held that the cause of action accrued the day the stock was unlawfully converted, "and the operation of the three-year Statute of Limitations began immediately." Id. at 383-84.

Here, plaintiffs allege in their statement of facts that they communicated with MarineMax representatives "[f]or several months leading up to April 1, 2007 . . . to assure that all the necessary steps had been or would be taken to lift the restrictions <u>immediately on April 1, 2007</u>." Am. Compl. ¶ 40 (emphasis added). In their first claim for relief, plaintiffs further allege that they "presented MarineMax with the request to have the restrictions from their shares lifted," and "[d]espite that request, MarineMax refused to lift and otherwise delayed lifting the restrictions from Plaintiffs' common stock." Id. ¶ 51. Conspicuously, plaintiffs avoid citing a specific date on which they presented MarineMax with the request to have the restrictions lifted. But the implication is clear: MarineMax's initial refusal allegedly took place on April 1, 2007, the date they "could have and should have . . . lifted" the restrictions. Am. Compl. ¶ 39. On that day, plaintiffs could have sought an injunction under the statute to compel MarineMax to lift the restrictions. See Loretto Literary & Benevolent Inst., 444 A.2d at 259. Therefore, if plaintiffs were now seeking an injunction more than three years after the date their cause of action for injunctive relief accrued, that claim would plainly be time-barred. It would be surprising, to say the least, if a cause of action for damages were to run on a totally separate calendar. See Adams v. Jankouskas, 452 A.2d 148, 157 (Del. 1982) (holding that "absent unusual circumstances," the statute of limitations and the time-bar imposed by the equitable doctrine of laches are the same under Delaware law).

Nevertheless, plaintiffs argue they are not time-barred for two reasons: First, they argue that defendants' alleged violation of § 8-401 is a "continuing wrong," and, thus, the cause of action accrues only when the last act evidencing the continuing wrong is committed. Pls.' Opp'n Mem. 9. Second, they assert that because a claim becomes enforceable only "'when all the

elements of the [claim] can be truthfully alleged in a complaint,'" id. (quoting Ruiz v. Suffolk County Sheriff's Dep't, No. 03 CV 3545(DLI)(ETB), 2008 WL 4516222, at *12 (E.D.N.Y. Oct. 2, 2008) (alteration in Ruiz)), and "loss" is a necessary element of a § 8-401 claim, their claim could not have accrued until the date the stock actually became unrestricted and plaintiffs could calculate their loss – i.e., August 17, 2009. Id. Plaintiffs cite Kernes v. Dukes, No. Civ.A.1999-S, 2004 WL 766529 (Del. Ch. Apr. 2, 2004), an unpublished Delaware Court of Chancery opinion in a civil rights case for their "continuing wrong" theory. In that case, Vice Chancellor Parsons eloquently makes clear what is wrong with both of plaintiffs' arguments, stating:

> Not surprisingly, Plaintiffs seek to save their cause of action by arguing that the [defendant's actions] were continuing wrongs. If there is a continuing wrong, the cause of action is timely so long as the last act evidencing the continuing wrong falls within the limitations period. That is, the cause of action does not accrue until the last act of the continuing wrong. Generally, all the elements of a cause of action must be present before the cause of action will accrue. However, where suit can be brought immediately and complete and adequate relief is available, a cause of action cannot be tolled as a continuing violation. The only element missing from Plaintiffs' cause of action at the time the [action accrued] was significant money damages giving Plaintiffs an incentive to bring their action. Injunctive relief, however, was available to prevent or reduce any damages.

Kernes, 2004 WL, 766529, at *4 (emphasis added). Here, similarly, a suit could have been brought immediately on April 1, 2007, or shortly thereafter, to compel MarineMax to issue the stock certificates without the restrictive legend. See Bender v. Memory Metals, Inc., 514 A.2d 1109, 1119 (Del. Ch. 1986) (granting summary judgment to plaintiff in suit to compel lifting of stock restriction). Of course, plaintiffs were free not to pursue injunctive relief, but plaintiffs cannot now rely on that choice to assert a "missing element" of damages, when injunctive relief was available to prevent or reduce damages. Further, even if plaintiffs did not realize the extent of their loss until the restriction was lifted on August 17, 2009 – which is doubtful since

13

MarineMax "is a New York Stock Exchange-listed company," Am. Compl. ¶ 11, and therefore the stock price was publicly available – they still had more than seven months before the statute of limitations ran out on April 1, 2010 to file a cause of action for damages. Instead, they waited until January 26, 2012 to file the instant suit. Accordingly, plaintiffs' claim for a violation of § 8-401 is barred by the statute of limitations.[3]

(b) <u>Breach of Fiduciary Duty against McGill, McLamb, Aiello, and Kant for failure to lift the stock restrictions</u> (third cause of action)

Plaintiffs' third claim for relief alleges that McGill, McLamb, Aiello, and Kant, as "directors or executives of MarineMax," Am. Compl. ¶ 64, owed plaintiffs a fiduciary duty, which they breached "by refusing to take action or direct others to take action necessary to lift the restrictions on Plaintiffs' stock for more than two years from the time the restrictions could have and should have been lifted," <u>id.</u> ¶ 65. Defendants argue that this claim is barred by the statute of limitations, fails to overcome the business judgment rule, and is duplicative of plaintiffs' breach of contract claim. Defs.' Supp. Mem. 11-15, 17. Defendants also argue that the claim of breach of fiduciary duty against Kant must be dismissed because "Kant, in his capacity as outside counsel to the Company, owed no fiduciary duty to Plaintiffs." <u>Id.</u> at 16.

(1) *Choice of Law*

Preliminarily, there is a dispute between the parties about what law governs the breach of fiduciary duty claim. Defendants argue that Delaware law governs breach of fiduciary duty claims against directors of a Delaware corporation. Defs.' Supp. Mem. 12 (citing <u>Walton v. Morgan Stanley & Co.</u>, 623 F.2d 796, 798 n.3 (2d Cir. 1980)). Plaintiffs argue that New York

_____

[3]Having found that plaintiffs' statutory claim is time-barred, I do not reach the question of whether plaintiffs demonstrated compliance with the preconditions of § 8-401.

14

law applies, citing § 11.2 of the APA, which provides: "**Controlling Law.** This Agreement, and all questions relating to its validity, interpretation, performance, and enforcement, shall be governed by and construed in accordance with the law of New York, notwithstanding any New York or other conflict-of-law provisions to the contrary." Pls.' Opp'n Mem. 13. Plaintiffs further argue that their "breach of fiduciary duty claims arise, in part, based on the relationships established in the APA." Id. The choice of law question is important because even though New York law imposes the same three-year statute of limitations for a claim of breach of fiduciary duty where the primary relief sought is money damages, IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268, 272 (N.Y. 2009), New York and Delaware law provide different standards for tolling the statutory period. Compare Kahn v. Seaboard Corp., 625 A.2d 269, 276 (Del. Ch. 1993) (equitable tolling permitted in certain cases under Delaware law "until the shareholders knew or had reason to know of the facts constituting the alleged wrong") with Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 519 (2d Cir. 2001) (equitable tolling permitted under New York law until "the fiduciary relationship is openly repudiated or otherwise ended"). "Moreover, where an allegation of fraud is essential to a breach of fiduciary duty claim, [New York] courts have applied a six-year statute of limitations under CPLR 213(8)." IDT Corp., 907 N.E.2d at 272.

Plaintiffs' reliance on the choice of law provision in the APA is self-defeating. If the breach of fiduciary duty claim indeed arises from the duties imposed by the APA, the claim is duplicative of the breach of contract claim, and is therefore subject to dismissal. See Atlantis Info. Tech., GmbH v. CA, Inc., 485 F. Supp. 2d 224, 232 (E.D.N.Y. 2007) ("Even if the Court were to find that the Plaintiff adequately pleaded the existence of a fiduciary relationship, the

Court nevertheless would grant the motion to dismiss because the breach of fiduciary duty claim

is based upon the same allegations contained in the first count of the amended complaint to

recover damages for breach of contract."); Cal Distrib. Inc. v. Cadbury Schweppes Am.

Beverages, Inc., No. 06 Civ.0496 RMB JCF, 2007 WL 54534, at *9 (S.D.N.Y. Jan. 5, 2007) ("A

cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract

claim cannot stand.") (internal quotation marks omitted); Blue Chip Capital Fund II Ltd. P'ship

v. Tubergen, 906 A.2d 827, 833 (Del. Ch. 2006) ("[I]f the dispute relates to rights and

obligations expressly provided by contract, the fiduciary duty claims would be superfluous.")

(internal quotation marks omitted). If, on the other hand, plaintiffs are arguing that defendants

owed them a fiduciary duty as shareholders, which plaintiffs do in part, see Pls.' Opp'n Mem. 11,

that claim does not rest on a "question[] relating to [the APA's] validity, interpretation,

performance, and enforcement." APA § 11.2. Therefore, the controlling law provision of the

APA would not apply.[4] In that case, "New York law dictates that the law of the state of

incorporation governs an allegation of breach of fiduciary duty." Walton, 623 F.2d at 798 n.3;

accord Mar-Cone Appliance Parts Co. v. Mangan, – F. Supp. 2d –, No. 10-CV-999A, 2012 WL

3009709, at *11 (W.D.N.Y. July 20, 2012) (minority shareholder's fiduciary duty claims against

majority shareholders governed by law of state of incorporation); In re BP p.l.c. Derivative Litig.,

---

[4]Plaintiffs try to have it both ways by selectively quoting language in the APA that they argue "explicitly establishe[s] a fiduciary relationship between Plaintiffs and the Individual Defendants." Pls.' Opp'n Mem. 11. However, as defendants point out, see Defs.' Reply Mem. 5 n.4, the provision of the APA that plaintiffs cite merely states that the parties agree to undertake good faith efforts to consummate the agreement "subject to fiduciary duties under applicable law." APA § 5.5 In other words, all this provision says about the parties' fiduciary duties is that the obligations under the agreement are still subject to fiduciary duties outside of the agreement.

507 F. Supp. 2d 302, 307-08 (S.D.N.Y. 2007) ("internal affairs doctrine" governed choice of law in shareholders' derivative suit against corporate officers).  Accordingly, Delaware law would control any claim that defendants breached a fiduciary duty to plaintiffs as shareholders.

      (2)    *Statute of Limitations*

Under Delaware law, breach of fiduciary duty claims are governed by a three-year statute of limitations.  In re Tyson Foods, Inc., 919 A.2d 563, 584 (Del. Ch. 2007) (citing Del. Code. Ann. tit. 10, § 8106).  "The statute of limitations begins to run at the time that the cause of action accrues, which is generally when there has been a harmful act by a defendant ."  Id.  Thus, plaintiff's claim for breach of fiduciary duty based on defendants' failure to lift the stock restrictions is governed by the same analysis as their Delaware U.C.C. § 8-401 claim.  Having determined that the cause of action for defendants' failure to lift the stock restrictions accrued under Delaware law on April 1, 2007, the statute of limitations on a breach of fiduciary duty claim stemming from this wrongful act would also begin to run on that date.  Cf. Kahn v. Seaboard Corp., 625 A.2d at 270-71 (holding that breach of fiduciary duty stemming from defendants' authorization of contract that was disadvantageous to their own corporation accrued at moment defendants entered into contract, and was not "continuing wrong").  Plaintiffs' argument that the cause of action could not accrue until the "damages element of the claim could be calculated," Pls.' Opp'n Mem. 14, is unavailing here for the same reasons as discussed with respect to their Delaware U.C.C. § 8-401 claim.  Thus, absent tolling, the statute of limitations on plaintiffs' breach of fiduciary duty claim expired on April 1, 2010.

17

(3)    *Equitable Tolling*

The statute of limitations may be tolled when the defendant "has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth." In re Tyson Foods, 919 A.2d at 585. Alternatively, "the doctrine of equitable tolling stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary." Id.; accord Pfeiffer v. Toll, 989 A.2d 683, 691 (Del. Ch. 2010), abrogated on other grounds by Kahn v. Kolberg Kravis Roberts & Co., L.P., 23 A.3d 831 (Del. 2011). Delaware law specifically recognizes that acts of self-dealing by a fiduciary can form a basis for equitable tolling. See Kahn v. Seaboard Corp., 625 A.2d at 276 ("[I]n the context of an existing fiduciary relationship and a claim of actionable self-dealing, I must express a contrary opinion to that expressed in Halpern v. Barran to the effect that without an affirmative act of concealment by defendant, plaintiff's ignorance of the facts constituting the alleged wrong cannot act to toll the running of the statute of limitations. In my opinion, at least in some circumstances, it can.") (internal citation omitted); In re Marvel Entm't Grp., Inc., 273 B.R. 58, 77 (D. Del. 2002) (reviewing Delaware tolling mechanisms). However, equitable tolling extends the statute of limitations only "until the shareholders knew or had reason to know of the facts constituting the alleged wrong." Kahn v. Seaboard Corp., 625 A.2d at 276.

Under Delaware law, "a plaintiff bears the burden of showing that the statute was tolled." In re Tyson Foods, Inc., 919 A.2d at 585; Kahn v. Seaboard Corp., 625 A.2d at 277 ("[P]laintiff . . . has the burden to plead and prove facts that will qualify his case for the tolling principle . . . ."). Plaintiffs here have not asserted that they are entitled to tolling on the basis of fraudulent concealment. Nor have they advanced an argument for equitable tolling. However,

taking all inferences in favor of plaintiffs, the Amended Complaint does allege a fiduciary relationship between all of the named defendants and plaintiffs at least insofar as plaintiffs became shareholders. Am. Compl. ¶¶ 64-65. Further, the Amended Complaint alleges self-dealing by McGill, McLamb, and Aiello though their insider sales. Id. ¶¶ 72-73. Thus, although plaintiffs advance no argument for equitable tolling, a plausible – and charitable – reading of the complaint allows me to infer facts that would form a basis for tolling at least with respect to McGill, McLamb, and Aiello.

Such a reading is of no moment, however, since plaintiffs had constructive notice of the corporate officers' alleged self-dealing in 2007. The Amended Complaint does not make clear when plaintiffs actually learned of the insider sales; instead, it simply alleges that "after" the insider sales, "[p]laintiffs abandoned their efforts to sell once the stock prices fell so dramatically." Am. Compl. ¶ 45. Nevertheless, plaintiffs had reason to know about the insider sales shortly after they occurred. This is because the Securities Exchange Act of 1934 requires directors, officers, and principal stockholders of any registered security to file a statement with the SEC noting any change in ownership over such security. 15 U.S.C. § 78p. The statement must include the "amount of all equity securities of such issuer of which the filing person is the beneficial owner[,] . . . ownership by the filing person at the date of filing, [and] any such changes in such ownership." Id. § 78p(a)(3)(A)-(B). A statement of change in ownership must be filed "before the end of the second business day following the day on which the subject transaction has been executed" unless the SEC establishes an exception to the two-day period. Id. § 78p(a)(2)(C). As of July 30, 2002, the SEC provides all such statements electronically on a publicly accessible Internet site. Id. § 78p(a)(4)(B). Accordingly, every time one of the named

19

defendants engaged in an insider sale, he filed an SEC Form 4 Statement of Changes in Beneficial Ownership, which was publicly available through the SEC's EDGAR database. E.g., MarineMax, Inc., Statement of Changes in Beneficial Ownership (Form 4) (Nov. 29, 2007) (McLamb filing); MarineMax, Inc., Statement of Changes in Beneficial Ownership (Form 4) (May 24, 2007) (McGill filing); MarineMax, Inc., Statement of Changes in Beneficial Ownership (Form 4) (May 24, 2007) (Aiello filing). Again taking judicial notice of MarineMax's public SEC filings, see Coleman & Co. Sec., Inc., 236 F. Supp. 2d at 308-09, I find that plaintiffs had reason to know about all of the insider sales within days of their occurrence. See Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350-51 (2d Cir. 1993) (holding information in prospectuses was "sufficient to put a reasonable investor of ordinary intelligence on notice" about high degree of risk associated with securities); DeBruyne v. Equitable Life Assurance Soc'y of the U.S., 920 F.2d 457, 466 n.18 (7th Cir. 1990) ("[P]laintiffs cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put them on inquiry notice."). Even if equitable tolling were applied to plaintiffs' breach of fiduciary duty claim, at most it would toll the statute of limitations until December 26, 2007, the date McLamb filed a Form 4 statement publicly disclosing the last insider sale complained of by plaintiffs. See MarineMax, Inc., Statement of Changes in Beneficial Ownership (Form 4) (Dec. 26, 2007). The statute of limitations therefore ran, at the latest, on December 26, 2010, over a year before plaintiffs filed the instant suit.

Accordingly, to the extent plaintiffs' third cause of action for breach of fiduciary duty is premised on the duty defendants owed to plaintiffs as shareholders under Delaware law, the claim is barred by the statute of limitations.

(4)     *Relationship of Trust and Confidence Independent of the Contract*

Plaintiffs also fail to allege a relationship of trust and confidence apart from the contract that would impose a fiduciary duty under New York law. Cf. St. John's Univ., N.Y. v. Bolton, 757 F. Supp. 2d 144, 166-67 (E.D.N.Y. 2010); Mandelblatt v. Devon Stores, Inc., 521 N.Y.S.2d 672, 676 (N.Y. App. Div. 1987) ("It is well settled that the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself."). To determine whether the parties developed such a relationship of trust and confidence, "'a court will look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge.'" St. John's Univ., 757 F. Supp. 2d at 167 (quoting Wiener v. Lazard Freres & Co., 672 N.Y.S.2d 8, 14 (N.Y. App. Div. 1998)). This inquiry is "fact-specific," Henneberry v. Sumitomo Corp. of Am., 532 F. Supp. 2d 523, 551 (S.D.N.Y. 2007) (internal quotation marks omitted), and is therefore generally inappropriate for dismissal on a 12(b)(6) motion. However, a conclusory allegation that the parties "developed a relationship of trust and confidence apart from their contractual relationship," Pls.' Opp'n Mem. 11, is insufficient to plead a fiduciary relationship and survive a motion to dismiss. See Faulkner v. Arista Records LLC, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009) (conclusory allegation of a "long and enduring relationship . . . of trust and confidence" held insufficient to survive 12(b)(6) motion); Atlantis Info. Tech., GmvH, 485 F. Supp. 2d at 231-32 (plaintiff's allegation that defendant had "superior knowledge" insufficient to allege fiduciary duty where plaintiff did not allege "facts suggesting an obvious disparity between the parties") (internal quotation marks omitted); Cooper v. Sony Records Int'l, No. 00 CIV. 233(RMB), 2001 WL 1223492, at *5 (S.D.N.Y. Oct. 15, 2001)

("Plaintiffs' conclusory allegations that a fiduciary duty was owed by [defendant] cannot survive a motion to dismiss.").

The facts plaintiffs have alleged instead undermine any claim that they reposed confidence in, and reasonably relied on, the superior knowledge and expertise of defendants. Defendants did nothing outside of entering the contract that would have induced such reliance. To the contrary, they "[n]ever informed [plaintiffs] that any information, documentation, or representations other than what [defendants] already possessed were required to have the restrictions lifted," Am. Compl. ¶ 41, they "ignored numerous communications," id. ¶ 42, and "refused to assist" plaintiffs, id. ¶ 43. Plaintiffs' allegations suggest the parties had no more than an arms-length business relationship. See Henneberry, 532 F. Supp. 2d at 550 ("[P]arties dealing at arms length in a commercial transaction lack the requisite level of trust or confidence between them necessary to give rise to a fiduciary obligation, absent extraordinary circumstances."); WIT Holding Corp. v. Klein, 724 N.Y.S.2d 66, 68 (N.Y. App. Div. 2001) ("Under these circumstances, where the parties were involved in an arms-length business transaction involving the transfer of stocks, and where all were sophisticated business people, the plaintiff's cause of action to recover damages for breach of fiduciary duty should have been dismissed."). Defendants also did not have the type of "special skill, knowledge, and expertise" necessary to impose a fiduciary obligation. Henneberry, 532 F. Supp. 2d at 553; see Ross v. FSG PrivatAir, Inc., No. 03 Civ. 7292(NRB), 2004 WL 1837366, at *6 (S.D.N.Y. Aug. 17, 2004) ("Fiduciary obligations are not imposed on one party merely because it possesses relative expertise as compared to the other."). Plaintiffs' allegations imply, but do not specifically state, that Kant was the only person who could provide "the necessary legal opinion" to lift the restrictions on the

22

stock. Am. Compl. ¶ 44. Neither the pleadings, the APA, nor the stock certificate – whose restrictive legend merely requires "an opinion of counsel satisfactory in form and substance to the issuer," Defs.' Mot. to Dismiss, Ex. B (emphasis added)[5] – provides an explanation of why an opinion letter specifically from Kant was necessary. See Kolber v. Body Cent. Corp., No. 11-731-RGA, 2012 WL 3095324, at *2 (D. Del. July 30, 2012) ("Although Plaintiffs allege that they 'needed to obtain an opinion from the Company's counsel issued to the Company's transfer agent,' the restrictive legend only required that a Rule 144 opinion be issued by counsel, not necessarily [Defendant's] counsel."); see also Bender, 514 A.2d at 1112 (noting that in response to defendant's counsel's refusal to issue letter opining that requirements of SEC Rule 144 had been met, plaintiff's counsel submitted opinion letter). Plaintiffs were plainly aware of the requirements of Rule 144 and the restrictive legend, and could have taken at least one step – getting a letter from counsel – to compel defendants to lift the stock restriction before seeking injunctive relief. But they chose not to. This is not a case like St. John's University, where the defendants had "special knowledge and expertise," upon which plaintiff was "dependent," thus making plaintiffs "necessarily" reliant on defendants and "vulnerable to [defendants'] abuse of their positions of trust which they willingly solicited and accepted." 757 F. Supp. 2d at 168. Instead, plaintiffs' pleadings belie the notion that there was a "special relationship or extraordinary circumstances," Henneberry, 532 F. Supp. 2d at 554, giving rise to a fiduciary relationship independent of the contract. See Societe Nationale D'Exploitation Industrielle Des Tabacs et Allumettes v. Salomon Bros. Int'l Ltd., 674 N.Y.S. 2d 648, 649 (N.Y. App. Div. 1998)

---

[5] I take notice of the stock certificate as a document that is integral to several of plaintiffs' claims. See Int'l Audiotext Network, 62 F.3d at 72.

("[T]he requisite high degree of dominance and reliance must have existed prior to the transaction giving rise to the alleged wrong, and not as a result of it."). Accordingly, plaintiffs cannot allege a fiduciary relationship under New York law.[6]

Plaintiffs cannot allege a fiduciary duty, other than one for which their cause of action is time-barred under Delaware law. Consequently, their third cause of action fails.[7]

    (c)   Breach of Fiduciary Duty against McGill, McLamb, and Aiello for their alleged "insider sales" of MarineMax stock (fourth cause of action)

Plaintiffs' fourth cause of action alleges breach of fiduciary duty by McGill, McLamb, and Aiello for "refusing to lift the stock restrictions on Plaintiffs' MarineMax shares and by selling their own shares during the period in which Plaintiffs' shares were being wrongfully restricted." Am. Compl. ¶ 72. Plaintiffs allege that defendants' actions were based on "material inside information" that plaintiffs planned to sell their MarineMax stock once the restrictions were lifted. Id. ¶ 70. Thus, plaintiffs allege a breach of fiduciary duty premised on insider trading, also known as a Brophy claim, see Brophy v. Cities Serv. Co., 70 A.2d 5 (Del. Ch. 1949). A Brophy claim "arises where '1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information.'" In

---

[6]As there is no fiduciary relationship under New York law, there cannot be a "fraud-based" breach of fiduciary duty claim that would trigger New York's six-year statute of limitations. See Pls.' Opp'n Mem. 14. Moreover, as discussed below, plaintiffs fail to allege fraud under the heightened pleading standards of Rule 9(b). See Malmsteen v. Berdon, LLP, 477 F. Supp. 2d 655, 667 (S.D.N.Y. 2007) ("The applicability of the longer limitations period depends on the viability of [plaintiff's] other allegations.").

[7]Having found that plaintiffs cannot establish a fiduciary duty, I do not reach the question of whether plaintiffs' allegations overcome the business judgment rule. Nor do I reach the question of whether Kant owed plaintiffs a fiduciary duty in his capacity as outside counsel.

re Am. Int'l Grp., Inc., 965 A.2d 763, 800 (Del. Ch. 2009) (quoting In re Oracle Corp., 867 A.2d
904, 934 (Del. Ch. 2004)).

Plaintiffs cannot bring this claim, however, because it is derivative in nature.[8] In order to
determine whether a claim gives rise to a direct or derivative suit, Delaware law requires that a
court

> look to the nature of the wrong and to whom the relief should go. The
> stockholder's claimed direct injury must be independent of any alleged injury to
> the corporation. The stockholder must demonstrate that the duty breached was
> owed to the stockholder and that he or she can prevail without showing an injury
> to the corporation.

Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1039 (Del. 2004); see also
Stephenson v. Citco Group Ltd., 700 F. Supp. 2d 599, 610 (S.D.N.Y. 2010) ("[T]he Tooley test
inquires into what duty was breached, what injury was suffered, and what relief is
available . . . ."). Insider trading constitutes a breach of fiduciary duty because it violates the duty
of loyalty. See Brophy, 70 A.2d at 8 (citing Guth v. Loft, Inc., 5 A.2d 503 (Del. 1939)); see also
Pfeiffer, 989 A.2d at 695-97 & n.5 (describing Brophy's reliance on Guth to establish tort of
breach of fiduciary duty for insider trading). In the seminal Guth case, the Delaware Supreme

---

[8]Defendants argue both that plaintiffs' Brophy claim is derivative in nature and that it is
time-barred. Defs.' Supp. Mem. 14, 17-18. I address the question of the nature of the claim
because the answer will impact other claims. But I note that the claim is also time-barred. Like
other kinds of breach of fiduciary duty, this claim is subject to Delaware's three-year statute of
limitations. See In re Tyson Foods, 919 A.2d at 584. The latest insider sale that plaintiffs allege
occurred when McLamb sold 5,000 shares on December 21, 2007. Am. Compl. ¶ 44(b).
Consequently, the statute of limitations ran on all of plaintiffs' insider trading claims more than
two years before they filed this lawsuit. Again, the Amended Complaint does not make clear
when plaintiffs actually knew of the insider sales. But, as discussed above, plaintiffs were on
constructive notice of the insider sales within days of their occurrence based on defendants'
public SEC filings. Therefore, even if equitable tolling applies, it ceased to toll the statute of
limitations on December 27, 2007, when plaintiffs should have known of the last insider sale.

25

Court described the remedy for a violation of the duty of loyalty as follows: "If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired <u>with a trust for the benefit of the corporation</u>, at its election, while it denies to the betrayer all benefit and profit." 5 A.2d at 510 (emphasis added). Ever since, Delaware courts have repeatedly stated that the proper remedy for a <u>Brophy</u> violation is disgorgement. <u>See, e.g.</u>, <u>Kahn v. Kolberg Kravis Roberts & Co.</u>, 23 A.3d at 840; <u>In re Am. Int'l Grp., Inc.</u>, 965 A.2d at 800; <u>Guttman v. Huang</u>, 823 A.2d 492, 505 (Del. Ch. 2003)). Plainly, the Delaware courts have envisioned the nature of the wrong in a <u>Brophy</u> claim as a breach of loyalty <u>to the corporation</u>, with the relief flowing to the corporation.

In <u>LaSala v. Bordier et Cie</u>, 519 F.3d 121 (3d Cir. 2008), the Third Circuit encountered a complaint alleging aiding and abetting breach of fiduciary duty, in which a type of insider trading scheme was alleged to have damaged "the Plaintiffs." <u>Id.</u> at 131. The corporate directors in the case engaged in a "pump-and-dump" scheme whereby they artificially inflated the price of the stock by representing that the corporation's financial position was stronger than it actually was, and then "dumped" the stock by selling their shares on the open market to innocent investors. <u>Id.</u> at 126. The court noted these were "insider-trading transactions," <u>id.</u>, which "constitute[d] a breach of their duty of loyalty to the corporation," <u>id.</u> at 129. The court then applied <u>Tooley</u> to determine whether plaintiffs' claims should be asserted directly or derivatively. <u>See id.</u> at 131. Two kinds of harms potentially arose from the directors' insider trading: First, those purchasers who overpaid for the stock were harmed to the extent of the value discrepancy between what they paid and what they received. <u>Id.</u> The Third Circuit noted that, while Delaware law recognized this as a direct harm, Delaware courts had foreclosed the possibility of relief for such harm under

state law, in deference to the remedies provided by federal securities laws. Id. (citing Malone v. Brincat, 722 A.2d 5, 12-13 (Del. 1998). Second, the corporation was harmed due to the pump-and-dump scheme, because it "lost its economic viability, as reflected in its declining stock price and eventual bankruptcy." Id. This harm, the court explained, is "purely derivative" under Delaware law. Id. (citing Metro Commc'ns Corp. BVI v. Advanced Mobilecomm Techs. Inc., 854 A.2d 121, 168 (Del. Ch. 2004)) Therefore, the Third Circuit held, the claims for aiding and abetting breach of fiduciary duty alleged harms to the corporation, which could be brought only in a derivative action. Id. at 131-32.

This case is quite like LaSala. Plaintiffs claim that defendants' insider trading "caused damage to Plaintiffs," Am. Compl. ¶ 75, but the diminution of stock value hurt the corporation, not just plaintiffs. Notably, plaintiffs respond to defendants' argument that their insider trading claims are derivative by arguing only that they have direct claims for "damages resulting from Individual Defendants' refusal to lift the stock restrictions and Plaintiffs' resulting inability to hedge and later to sell their shares," Pls.' Opp'n Mem. 16 – i.e. their other two breach of fiduciary duty claims. These other claims assert direct harms, but plaintiffs' insider trading claim asserts only derivative harm under Delaware law. As the Delaware Supreme Court noted in Tooley, "if an action is derivative, the plaintiffs are . . . required to comply with the requirements of Court of Chancery Rule 23.1, that the stockholder: (a) retain ownership of the shares throughout the litigation; (b) make presuit demand on the board; and (c) obtain court approval for any settlement." 845 A.2d at 1036. Plaintiffs do not allege that they have complied with any of these requirements. Further, of course, "the recovery, if any, flows only to the corporation." Id. Because plaintiffs cannot, under Delaware law, "state a direct claim of individual harm upon

which [they] can prevail that was not also suffered by the corporation," Poptech, L.P. v. Stewardship Inv. Advisors, LLC, 849 F. Supp. 2d 249, 263 (D. Conn. 2012) (applying Tooley test), plaintiffs' claim for breach of fiduciary duty for insider trading fails.

       (d)     Aiding and Abetting Breach of Fiduciary Duty by Kant (fifth cause of action)

Under Delaware law, "[a] claim for aiding and abetting requires the following three elements: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in that breach by [the defendant]." In re Santa Fe Pac. Corp. S'holder Litig., 669 A.2d 59, 72 (Del. 1995). Similarly, under New York Law, to state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege that there was "a breach by a fiduciary of obligations to" the plaintiff. Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006). As plaintiffs have been unable to demonstrate a breach of fiduciary duty under either Delaware or New York law, their claim for aiding and abetting breach of fiduciary duty likewise fails. See Schandler v. N.Y. Life Ins. Co., No. 09 CIV. 10463 LMM, 2011 WL 1642574, at *13 (S.D.N.Y. Apr. 26, 2011).

       (e)     Unjust Enrichment by McGill, McLamb, and Aiello (sixth cause of action)

Plaintiffs next assert a claim for unjust enrichment against McGill, McLamb, and Aiello. Am. Compl. ¶¶ 83-87. Plaintiffs' claim is premised on the fact that these defendants "well knew [that] Plaintiffs' sale of their MarineMax shares in the open market would have had a downward impact on the price of MarineMax shares." Id. ¶ 84. As a result, plaintiffs allege, defendants "were enriched, at the expense of Plaintiffs, by gaining millions of dollars in profit from the sale

of their MarineMax shares while Plaintiffs' shares remained restricted and unmarketable in the open market." Id. ¶ 85.

To state a claim for unjust enrichment, a plaintiff must allege facts that plausibly show: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006) (internal quotation marks omitted). In New York, "'[t]he theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement.'" Id. (quoting Goldman v. Metro. Life Ins. Co., 841 N.E.2d 742, 746 (N.Y. 2005)). As the New York Court of Appeals has explained:

> The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter. A "quasi contract" only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment. . . . Briefly stated, a quasi-contractual obligation is one imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved.

Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987) (internal citations omitted).

Plaintiffs argue that their quasi-contract claim should not be barred by the existence of the APA because the APA does not govern the same subject matter at issue in their unjust enrichment claim. Pls.' Opp'n Mem. 18. That subject matter, according to plaintiffs, is defendants' insider sales of their stock, "which the APA does not address." Id. But if that is so, plaintiffs' unjust enrichment claim is simply their allegation of breach of fiduciary duty for insider trading by another name. As explained above, that claim must be brought derivatively on

behalf of MarineMax. Accord O'Neill v. Warburg, Pincus & Co., 39 A.D.3d 281, 281–282 (N.Y. App. Div. 2007) ("An individual shareholder has no right to bring an action in his own name and in his own behalf for a wrong committed against a corporation. A claim for diminution of the value of stock holdings is a derivative cause of action belonging to that of the corporation and not to plaintiffs individually.") (internal quotation marks and citations omitted).[9]

Plaintiffs' claim for unjust enrichment is caught between the Scylla of the written agreement and the Charybdis of the derivative nature of their claim. Accordingly, the claim fails.

> (f)     Breach of Contract by MarineMax for failure to lift the stock restrictions
>          (eighth cause of action)

Plaintiffs' eighth claim for relief alleges that MarineMax breached the APA by refusing to provide the opinion letter to lift the restrictions imposed on the stock pursuant to Securities Act Rule 144. Am. Compl. ¶¶ 95-101. Plaintiffs state that "MarineMax stock was transferred to Plaintiffs under the Asset Purchase Agreement with the understanding that the parties would make the effort necessary to allow Plaintiffs to transfer or sell the stock." Id. ¶ 91. Plaintiffs allege that defendants violated § 5.5 of the APA, which provides:

> **Good Faith Efforts.** Subject to the terms and conditions of this Agreement, and subject to fiduciary duties under applicable law, as advised by counsel, each of the

---

[9]I recognize that in Agostino v. Hicks, 845 A.2d 1110 (Del. Ch. 2004), Chancellor Chandler noted a "limited" unjust enrichment exception under Delaware law to the general rule that a plaintiff alleging injury to the corporation must bring her claim derivatively. Id. at 1125. However, Tooley has since called that exception into doubt. See Aboushanab v. Janay, No. 06 Civ. 13472(AKH), 2007 WL 2789511, at *7 (S.D.N.Y. Sept. 26, 2007) ("It is not clear whether the 'unjust enrichment' exception that Chancellor Chandler described, then found inapplicable to the case before the Court of Chancery, survives Tooley . . . ."). I am persuaded by recent cases that have applied Tooley's standard to unjust enrichment claims and held those claims should be brought derivatively. See In re Evergreen Mut. Funds Fee Litig., 423 F. Supp. 2d 249, 260-61 (S.D.N.Y. 2006); Zutty v. Rye Select Broad Mkt. Prime Fund, L.P., 939 N.Y.S. 2d 745, at *6-7 (N.Y. Sup. Ct. Apr. 15, 2011) (unpublished table decision).

parties hereto agrees to use its good faith efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, to obtain all necessary, proper, or advisable permits, consents, authorizations, requests, and approvals of third parties and governmental authorities. If at any time after the Closing Date, any further action is necessary or desirable to carry out the purposes of this Agreement (including providing any information in any way related to the assets to be purchased pursuant to this Agreement), the proper officers and directors of each party to this agreement shall take all such action.

APA § 5.5. Plaintiffs also allege that defendants violated the covenant of good faith and fair dealing. Am. Compl. ¶ 100. For their part, defendants argue that plaintiffs cannot identify "any provision actually appearing in the APA" that obligates defendants to lift the restrictions. Defs.' Supp. Mem. 22. Further, defendants point to the APA's merger clause, which states, in part:

This agreement and the Schedules and Exhibits hereto contain the entire understanding among the parties . . . and supersede all prior and contemporaneous agreements and understandings, inducements, or conditions, express of implied, oral or written, except as herein contained. The express terms hereof control and supersede any course of performance and/or usage of trade inconsistent with any of the terms hereof.

APA § 11.4. Thus, according to defendants, "Plaintiffs' reliance upon an unwritten 'understanding' extrinsic to the APA is explicitly unenforceable." Defs.' Supp. Mem. 23.

To recover on a breach of contract claim under New York law, a plaintiff must establish: "(1) the existence of a valid contract; (2) due performance by the plaintiff; (3) breach by the defendant; and (4) damages to [plaintiff] caused by the breach." DLJ Mortg. Capital Inc. v. Home Loan Corp., 667 F. Supp. 2d 368, 368 (S.D.N.Y. 2009). "It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." W.W.W. Associates, Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990) (internal quotation marks omitted). However, "[u]nder New

York law, contracts must be 'construed in accord with the parties' intent.'" Banco Multiple Santa Cruz, S.A. v. Moreno, — F. Supp. 2d —, No. 08-CV-1271(JG)(ALC), 2012 WL 3775998, at *5 (E.D.N.Y. Aug. 31, 2012) (quoting Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002)). "'[T]hat a specific promise has not been expressly stated does not always mean that it was not intended.'" Id. (alteration in original) (quoting Havel v. Kelsey–Hayes Co., 445 N.Y.S.2d 333, 335 (N.Y. App. Div. 1981)).

> As Justice Cardozo wrote nearly 100 years ago, "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be instinct with an obligation, imperfectly expressed. If that is so, there is a contract."

Id. at *6 n.13 (quoting Wood v. Lucy, Lady Duff–Gordon, 118 N.E. 214, 214 (N.Y. 1917)). Therefore, the absence of a specific, explicit obligation to permit plaintiffs to sell their stock is not fatal to their breach of contract claim. Moreover, the second sentence of the Good Faith Efforts provision of the APA suggests, though not unambiguously, an understanding that the parties would take steps to effectuate a sale of the stock:

> If at any time after the Closing Date, any further action is necessary or desirable to carry out the purposes of this Agreement (including providing any information in any way related to the assets to be purchased pursuant to this Agreement), the proper officers and directors of each party to this agreement shall take all such action.

APA § 5.5 (emphasis added). If nothing else, the purpose of the agreement was to exchange Surfside-3 Marina, Inc. for cash and stock, and the parties plainly understood that stock to be worth something. At the very least, this court cannot accept, as a matter of law, defendants' assertion that their only obligation was to issue restricted stock. See Defs.' Supp. Mem. 23; Defs.' Reply Mem. 12; see also Royal Dispatch Servs. Inc. v. UBS Fin. Servs. Inc., 12-CV-2032

(JG)(RLM), 2012 WL 3113291, at *4-5 (E.D.N.Y. July 31, 2012) (declining to dismiss case based on defendant's interpretation of contract, where plaintiff's interpretation was also plausible).

Even if plaintiffs' breach of contract claim could not be read into the Good Faith Efforts clause of the contract, "'[u]nder New York law, a covenant of good faith and fair dealing is implied in all contracts.'" State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 169 (2d Cir. 2004) (quoting 1-10 Indus. Assoc., LLC v. Trim Corp. of Am., 747 N.Y.S.2d 29, 31 (N.Y. App. Div. 2002)).[10] The covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." 511 West 232nd Owners Corp. v. Jennifer Realty Co., 773 N.E.2d 496, 500 (N.Y. 2002) (internal quotation marks omitted). "[A]s long as the implied term is consistent with other terms in the contract, 'a merger clause does not prevent a court from inferring a covenant of good faith and fair dealing.'" Dorset Indus., Inc. v. Unified Grocers, Inc., No. 11-CV-6337(ADS)(GRB), 2012 WL 4470423, at *9 (E.D.N.Y. Sept. 27, 2012) (quoting SNS Bank, N.V. v. Citibank, N.A., 777 N.Y.S. 2d 62, 65 (N.Y. App. Div. 2004)). Therefore, the existence of the merger clause by itself does not preclude plaintiffs from alleging breach of

---

[10]As a general rule, a claim for breach of the implied covenant of good faith and fair dealing "will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." ICD Holdings S.A. v. Frankel, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997) (internal quotation marks omitted). However, here, plaintiffs do not allege the implied covenant as a separate cause of action. Therefore, their claim of a breach of the implied covenant of good faith and fair dealing may be seen as in-the-alternative of their breach of contract claim. See Leberman v. John Blair & Co., 880 F.2d 1555, 1560 (2d Cir. 1989) ("Leberman was specifically bound by the contract to act in good faith. In addition, a covenant of good faith and fair dealing is implied in every contract governed by New York law like the instant contract.").

33

contract. See generally Technest Holding, Inc. v. Deer Creek Fund LLC, No. 06 Civ. 1665(HBP), 2008 WL 3449941, at *15-16 (S.D.N.Y. Aug. 12, 2008) (finding defendants breached implied covenant of good faith and fair dealing by restricting stock sales). I need make no judgment here regarding the strength or weakness of plaintiffs' claim for breach of the covenant of good faith and fair dealing; that is a "determination for another day." Toledo Fund, LLC v. HSBC Bank USA, Nat'l Assoc., No. 11 Civ. 7686(KBF), 2012 WL 364045, at *4 (S.D.N.Y. Feb. 3, 2012); cf. Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 408 (2d Cir. 2006) ("[T]he implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract.") (internal quotation marks omitted). Instead, I must decide whether, as a matter of law, it is plausible to infer that MarineMax "breached the contract in the manner alleged in the complaint." Toledo Fund, 2012 WL 364045, at *4.

Plaintiffs' claim of breach for failure to lift the stock restrictions is predicated on their assertion that Kant's refusal to provide an opinion letter prevented the restrictions from being lifted. I have already explained that an opinion letter from defendants' counsel was not necessary to lift the restrictions under Delaware law. See Kolber, 2012 WL 3095324, at *2; Bender, 514 A.2d at 1112. The breach of contract claim, however, is governed by New York law. APA § 11.2. New York law is not clear whether a plaintiff can cure refusal by defendant's counsel to issue an opinion letter by obtaining a letter from counsel of her own. Compare Netwolves Corp. v. Sullivan, No. 00 CIV. 8943(AGS), 2001 WL 492463, at *10 (S.D.N.Y. May 9, 2001) ("[U]nder N.Y. U.C.C. § 8-401, an issuer is obligated to provide an opinion of counsel unless it has reasonable grounds for refusing to do so.") with Catizone v. Memry Corp., 897 F. Supp. 732,

34

737 n.3 (S.D.N.Y. 1995) ("Plaintiff argues that a genuine issue of fact exists regarding whether his counsel's opinion letter was sufficient."). But more importantly, even if a letter from Kant was not in fact "necessary" to lift the restrictions, it may fall within the parties' understanding of what was "desirable to carry out the purposes of th[e] Agreement," APA § 5.5 (emphasis added). While New York law prescribes "reasonable grounds" for a refusal to register a transfer of stock, see Cohn v. Kenilworth Research & Dev. Corp., 79 CIV. 4227, 1982 WL 1308, at *3 (S.D.N.Y. May 25, 1982), the parties were free to contract around these default rules. Certainly, the "understanding" plaintiffs allege is not inconsistent with the express terms of the APA. The very nature of the deal was to exchange plaintiffs' business for cash and stock. It is implausible that plaintiffs would have agreed to such a deal if all that was required of defendants was to transfer stock that was restricted – and therefore worthless to plaintiffs. Although not covered by an express provision of the contract, I cannot say, as a matter of law, that it is impossible that defendants breached the contract by refusing to lift the stock restrictions. See Toledo Fund, 2012 WL 364045, at *4 ("[T]his Court can and should ask whether, as a matter of law, it is possible for defendant to have breached the contract in the manner alleged in the complaint. If the answer is 'yes,' then the action is well pled and may proceed.") (internal citations omitted). Based on the allegations before me, it is possible that defendants' actions constituted a breach of the contract. Consequently, plaintiffs' claim for breach of contract for failure to lift the stock restrictions survives defendants' motion to dismiss.

35

(g)  Tortious Interference with Contractual Relations by McGill, McLamb, Aiello, and Kant for failure to lift the stock restrictions (tenth cause of action)

Plaintiffs also bring a tortious interference claim against the individually named defendants premised upon the alleged breach of contract. "Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." Albert v. Loksen, 239 F.3d 256, 274 (2d Cir. 2001). A plaintiff must also allege that "there would not have been a breach but for the activities of defendants." Sharma v. Skaarup Ship Mgmt. Corp., 916 F.2d 820, 828 (2d Cir. 1990) (internal quotation marks omitted).

Defendants respond to the tortious interference claim by arguing that the individual defendants may not be held liable for any breach committed by the corporation. Defs.' Supp. Mem. 25-26.[11] While "[a] corporate officer or director generally cannot be liable for tortiously interfering with a contract between the corporation and a third party," an agent of a party to the contract can qualify as a third party if he acts outside the scope of his authority. Roselink Investors, L.L.C. v. Shenkman, 386 F. Supp. 2d 209, 228 (S.D.N.Y. 2004) (internal quotation marks omitted). Plaintiffs argue they have shown that the individual defendants acted outside of the scope of their authority because they committed independent tortious acts against plaintiffs, including breach of fiduciary duty and unjust enrichment. Pls.' Opp'n Mem. 21 (citing Roselink Investors, 386 F. Supp. 2d at 228). But, as discussed above, plaintiffs have failed to make out

---

[11]Defendants also argue the claim is time-barred, Defs.' Supp. Mem. 24-25, but I do not reach this issue.

their claims for these independent tortious acts. Even if they could, these alleged independent torts caused harm to the corporation – they were not "independent tortious act[s] against the plaintiff[s]." Albert, 239 F.3d at 275 (emphasis added). Therefore, plaintiffs have not advanced any viable theory that the individually named defendants acted outside of the scope of their authority as directors and officers of MarineMax. Accordingly, plaintiffs fail to allege plausibly tortious interference for failure to lift the stock restrictions.

(h)   Violation of the Securities Exchange Act § 10(b) (eleventh cause of action)

Plaintiffs have conceded that their eleventh claim for relief, for violations of the Securities Exchange Act, is barred by the statute of limitations. See Pls.' Letter in Opp'n to Defs.' Req. to File Mot. to Dismiss, Dkt. #12, at 6 n.5. Accordingly, the claim is dismissed.

(i)   Common Law Fraud (twelfth cause of action)

Finally, plaintiffs allege common law fraud against MarineMax, McGill, and Kant, charging that these defendants

> knowingly and intentionally made misrepresentations, including that Defendants were acting in good faith and fulfilling their fiduciary duties, and omitted to state material facts to Plaintiffs in order to prevent Plaintiffs from having the restrictions lifted on their MarineMax shares, thereby allowing MarineMax executives to dump their MarineMax stock while the stock remained at a high value.

Am. Compl. ¶ 136. Plaintiffs further allege that they "reasonably relied upon the representations herein alleged," id. ¶ 137, and "[i]n committing their fraud as alleged, Defendants . . . acted in reckless disregard for the truth, in conscious disregard of Plaintiffs' rights, and with malice and oppression so as to justify an award of punitive damages," id. ¶ 138.

37

Under New York law, the following elements of a fraud claim must be shown by clear and convincing evidence: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." Crigger v. Fahnestock & Co., Inc., 443 F.3d 230, 234 (2d Cir. 2006). "In pleading a claim of common law fraud, the plaintiffs must satisfy the requirements of [Federal] Rule [of Civil Procedure] 9(b) and the elements of the applicable state or federal substantive law." Alnwick v. European Micro Holdings, Inc., 281 F. Supp. 2d 629, 638 (E.D.N.Y. 2003). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. Proc. 9(b). The Second Circuit has explained that in order to comply with the heightened pleading requirements of Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks omitted). "[T]his requires the plaintiff to identify which defendant caused each allegedly fraudulent statement to be spoken, written, wired or mailed, and to whom the communication was made; when the communication was made; and how it advanced the fraudulent scheme." Alnwick, 281 F. Supp. 2d at 639 (citing McLaughlin v. Anderson, 962 F.2d 187, 191 (2d Cir.1992)). "Where there are multiple defendants, Rule 9(b) requires that the plaintiff allege facts specifying each defendant's contribution to the fraud." Id.

Plaintiffs here have not specified which statements they contend were fraudulent, other than the general representation that "Defendants were acting in good faith and fulfilling their fiduciary duties." Am. Compl. ¶ 136. But plaintiffs do not identify who made this representation, nor where and when the representation was made. Plaintiffs do not identify any statements McGill made to plaintiffs that might have been fraudulent; they merely allege that McGill "was advised about Kant's refusal to issue the required opinion letter" and he "ignored this information," id. ¶ 43. Therefore, as to McGill, plaintiffs have neither specified any statements that were fraudulent, nor have they specified where and when any such statements took place. As to MarineMax and Kant, plaintiffs state that neither "ever informed [plaintiffs] that any information, documentation, or representations other than what MarineMax and Kant already possessed were required from them in order to have the restrictions lifted in a timely fashion." Am. Compl. ¶ 41.[12] Thus, plaintiffs' fraud claims against each of the defendants at best amount to claims of fraudulent concealment of material information, rather than claims of affirmative false statements.

---

[12]Plaintiffs also point to a specific statement of Kant's in their opposition brief, saying that Kant "represented to Plaintiffs that the only remaining requirement to effectuate the private sale of Plaintiffs' stock was for Plaintiffs' broker to represent that it had determined none of the Plaintiffs had access to material non-public information." Pls.' Opp'n Mem. 22. However, plaintiffs may not amend their complaint via statements in their opposition papers. Midouin v. Downey Savings & Loan Assoc., 834 F. Supp. 2d 95, 112 n.20 (E.D.N.Y. 2011). Furthermore, that statement is not what the Amended Complaint alleges Kant said. The Amended Complaint alleges that Kant stated, perhaps confusingly, that "Bear Stearns would have to inform our firm and MarineMax that it had taken whatever steps it deems appropriate to assure itself that none of the sellers is in possession of material non-public information," Am. Compl. ¶ 29, but never alleges that Kant represented this as the "only remaining requirement," Pls.' Opp'n Mem. 22 (emphasis added).

In New York, "[t]he mere silence of defendants, unaccompanied by some act or conduct which deceived plaintiffs, [is] not an actionable fraud in the absence of any confidential or fiduciary relationship." Moser v. Spizzirro, 295 N.Y.S.2d 188, 188-89 (N.Y. App. Div. 1968). To establish fraudulent concealment, "a plaintiff must also prove that the defendant had a duty to disclose the material information." Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995). A duty to disclose arises "from a fiduciary or confidential relationship between the parties" or where "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows the second party is acting on the basis of mistaken knowledge." Id. at 155.

As discussed above, plaintiffs have failed to allege a fiduciary relationship owed specifically to them, rather than the corporation. Further, as discussed throughout this opinion, plaintiffs' ability to effectuate the private sale of their restricted stock and compel defendants to lift the stock restrictions depended on rights and duties imposed by the Securities Act. Defendants had no superior knowledge about the requirements of Rules 144 and 144A and there is no reason to suppose, based on the facts alleged, that plaintiffs were unsophisticated or that information about these requirements was "not readily available," id., to plaintiffs. Plaintiffs clearly hoped defendants would lift the stock restrictions immediately on April 1, 2007, and their failure to do so may have amounted to a breach of the APA. But nothing in the complaint creates a plausible inference that defendants engaged in fraudulent concealment or affirmative fraud. Plaintiffs have failed to plead their fraud claim in accordance with the pleading standards of Federal Rule of Civil Procedure 8(a), see Iqbal, 129 S. Ct. at 1949, let alone the heightened pleading standards of Rule 9(b). Accordingly, their claim of fraud is insufficient. Since this

claim is dismissed due to a pleading deficiency, plaintiffs will have leave to replead this claim only.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted as to all of plaintiffs' claims except breach of contract for failure to lift the stock restrictions. As all of the claims against McGill, McLamb, Aiello, and Kant have been dismissed, these defendants are dismissed from the case. Plaintiffs will have leave to replead their twelfth cause of action – common law fraud – within thirty days.

SO ORDERED.

s/Allyne R. Ross

_____
Allyne R. Ross
United States District Judge

Dated: December 3, 2012
        Brooklyn, New York