UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                     :

PAUL BARBARA, DIANE KENNEY, ANGELA    :    12-CV-0368 (ARR)(RER)
CHIANESE, and MATTHEW BARBARA,        :

                     :    NOT FOR PRINT
        Plaintiffs,            :    PUBLICATION
                     :

     -against-               :    OPINION AND ORDER
                     :

MARINEMAX, INC.                :

                     :
        Defendant.          :

                     :
------------------------------------------------------------------- X

ROSS, United States District Judge:

       Plaintiffs, Paul Barbara, Diane Kenney, Angela Chianese, and Matthew Barbara

("plaintiffs"), sold their family-owned boat business to MarineMax, Inc., ("defendant" or

"MarineMax") in 2006. The purchase price was paid in cash and stock. The parties agreed that

the stock would be unregistered, thereby restricting public sales for at least a one-year holding

period. Plaintiffs ultimately sold their stock in 2009 and more than two years later brought the

instant action, claiming that after the one-year anniversary of the contract's execution, defendant

refused or failed to lift the restrictions on plaintiffs' stock. According to plaintiffs, defendant's

actions frustrated their efforts to sell before the stock price declined.

       A motion to dismiss narrowed plaintiffs' claims to one for breach of contract, premised

on the theory that defendant violated a provision obligating the parties to undertake "good faith

efforts" to do all that was "necessary and desirable" to carry out the terms of the agreement. The

parties conducted discovery, deposing plaintiffs, their financial advisors, defendant's officers

and outside counsel, and commissioning expert reports. Thereafter, MarineMax moved for

summary judgment, arguing that discovery revealed a lack of evidence upon which plaintiffs could sustain their claim. The court has reviewed the entire record, and has requested and reviewed supplemental submissions from plaintiffs. For the reasons explained below, the court agrees with defendant that the evidence fails to establish a genuine issue of material fact for trial. Accordingly, the motion for summary judgment is granted.

**BACKGROUND**

Unless otherwise indicated, the following facts are undisputed:[1]

I.    *Parties and Other Relevant Persons*

Plaintiffs are siblings who jointly owned a boat business called Surfside-3 Marina, Inc. ("Surfside"). Statement of Material Facts Pursuant to Local Rule 56.1 in Supp. of Def.'s Mot. for Summ. J. ("Def. Facts") ¶ 4. MarineMax is a publicly-held recreational boat dealer that, since its initial public offering, has acquired twenty-seven regional boat dealers, including Surfside. Def. Facts ¶¶ 1, 3, 9. William H. McGill, Jr. is Chairman of the MarineMax Board of Directors and the company's Chief Executive Officer. Id. ¶ 2. Michael H. McLamb is MarineMax's Chief Financial Officer. Id. Robert Kant is MarineMax's outside counsel at the firm of Greenberg Traurig, LLP, and a former member of the MarineMax Board. Id. ¶ 7; Decl. of Christopher R. Deubert ("Deubert Decl."), Ex. A, McGill Dep. 128-29. Michael Aiello is an employee of MarineMax, whose company was acquired in a deal similar to plaintiffs'. See generally Deubert Decl., Ex. E. Robert Kenney is the husband of plaintiff Diane Kenney and

---

[1]Where facts are undisputed, the court cites to defendant's statement of material facts only. Where there is some divergence between defendant's and plaintiffs' account of the facts, or some additional facts contained in plaintiffs' statement of material facts but not in defendant's, the court cites to both parties' statements of facts.

handled some financial matters for plaintiffs, including acting as liaison between plaintiffs and the former investment bank Bear Stearns. Def. Facts ¶ 19. Shelley Bergman is plaintiffs' financial advisor and broker, first at Bear Stearns and later at Morgan Stanley. Id. ¶ 16, 69; Response to Def. MarineMax, Inc.'s Statement of Material Facts Pursuant to L[ocal] Civ. R. 56.1. ("Pls. Facts") ¶ 19; Deubert Decl., Ex. L., Matthew Barbara Dep. 62-65. Bergman's team at Bear Stearns included Toni Srour from the bank's legal department, Def. Facts ¶ 20, as well as Lauren Mattson, Deubert Decl., Ex. J, Jason Bunin, id., Ex. K, and Melissa Medina, Kant Decl., Ex. N.

II.     *Acquisition of Surfside*

In 2005, MarineMax began negotiating with Paul Barbara and Matthew Barbara for the purchase of Surfside. Def. Facts ¶¶ 5-6. On March 31, 2006, the parties executed the Asset Purchase Agreement ("APA"), transferring ownership of Surfside to MarineMax in exchange for $45 million, of which 55% was to be paid in cash and 45% was to be paid in MarineMax common stock. Id. ¶ 9; Decl. of John A. Eakins ("Eakins Decl."), Ex. 2, at 9-10, APA § 3.1. The stock transferred to plaintiffs in partial consideration for the asset sale was restricted pursuant to Rule 144 under the Securities Act of 1933 ("the 1933 Act"), and the stock certificates contained a legend to that effect. Def. Facts ¶ 10; Eakins Decl., Ex. 2, at 20, APA § 4.1(w)(iii); id., Exs. 7-10. One of the topics of negotiation leading up to the execution of the APA was whether plaintiffs would be able to sell their stock after one or two years, with the parties ultimately agreeing to one year. Deubert Decl., Ex. A, McGill Dep. 204; id., Ex. L, Matthew Barbara Dep. 56; id., Ex. T, Paul Barbara Dep. 28. At the time the deal was completed, Paul Barbara had no intention to sell his stock upon the one-year anniversary of the execution of

the APA, Deubert Decl., Ex. T, Paul Barbara Dep. 31, while Matthew Barbara did intend to sell

after one year, but did not communicate that intention to anyone at MarineMax, id., Ex. L,

Matthew Barbara Dep. 59-61; accord id., Ex. A., McGill Dep. 208; id., Ex. B., McLamb Decl.

65-66.

Included in the APA was the following provision:

**Good Faith Efforts.** Subject to the terms and conditions of this Agreement, and subject to fiduciary duties under applicable law, as advised by counsel, each of the parties hereto agrees to use its good faith efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, to obtain all necessary, proper, or advisable permits, consents, authorizations, requests, and approvals of third parties and governmental authorities. If at any time after the Closing Date, any further action is necessary or desirable to carry out the purposes of this Agreement (including providing any information in any way related to the assets to be purchased pursuant to this Agreement), the proper officers and directors of each party to this agreement shall take all such action.

Eakins Decl., Ex. 2, at 28, APA § 5.5. Also included under a section designated "GENERAL"

was the following:

**Notices.** All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing . . . .

Id. at 41, APA § 11.3.

Concurrently with the execution of the APA, the parties executed an Escrow and Security

Agreement, by which they transferred 100,000 shares of MarineMax common stock into escrow

as security ("the escrow shares"), to be released by the parties' joint instructions on March 30,

2007, unless MarineMax made a prior indemnification claim against that collateral. Def. Facts.

¶¶ 9, 13. The remaining 565,024 shares were issued with the restrictive legend to another

corporation owned and controlled by the Barbara family known as Chrisbar Enterprises I, Inc.

("Chrisbar"). See Def. Facts ¶ 14-15; Pls. Facts ¶ 15. Following the acquisition of Surfside by MarineMax, Matthew Barbara became a regional president of MarineMax. See Deubert Decl., Ex. A, McGill Dep. 11.

III.  *Proposed Private Stock Sale to Bear Stearns*

In October 2006, plaintiffs entered into discussions with Bears Stearns about a possible private sale of their restricted MarineMax stock. Def. Facts ¶ 17. Plaintiffs' shares of MarineMax stock were deposited into Chrisbar's account at Bear Stearns on October 17. Id. ¶ 18. Starting the next week, the following email communications occurred:

- On October 23, 2006, Toni Srour from Bear Stearns' legal department sent an email to Robert Kant stating, "As we have just discussed, I have attached a draft of the private sale documents we propose to use in connection with the private sale of up to 565,024 shares . . . by Chrisbar Enterprises I, Inc. to Bear Stearns. Please call me at your convenience with any questions and/or comments." Deubert Decl., Ex. F.; Decl. of Robert Kant ("Kant Decl."), Ex. D.

- On October 24, 2006, Lauren Mattson of Bear Stearns wrote to Robert Kenney: "Kant doesn't have to sign anything. We just need his verbal agreement to authorize the transfer agent to re-register the shares into Bear's name now, and that when Bear ultimately sells the stock on the open market under Rule 144 (sometime after March 31, 2007) he will authorize the transfer agent to clean up the stock." Deubert Decl., Ex F.

- On October 26, 2006, Mattson wrote to Shelley Bergman & Robert Kenney: "No word back yet from Kant since we sent him the rep letters. We called him yesterday and were told he was out of the office for the day, and we called him today (12:30 NY time, 9:30 his time) and [were] told he was in the office but on the phone. We will continue to follow up." Id., Ex. G.

- On October 27, 2006, Robert Kenney wrote to plaintiffs explaining the terms of the private sale and saying "We're still waiting for Bob Kant to state his opinion on Bear selling the stock on 3/31/07. Paul is working on getting either McLamb or McGill to call Kant and put pressure on him to make the call to Bear." Id., Ex. H.

- On October 30, 2006, Mattson wrote to Robert Kenney asking if he, Matthew Barbara, or Paul Barbara had been able to get in touch with Kant or someone else at MarineMax. Id., Ex. I.

- Later on October 30, 2006, Mattson wrote to Robert Kenney saying, "What we need Kant to say is: 1) Surfside/Chrisbar are non-affiliates; 2) And therefore we can tack onto your holding period and sell in March. And at that time he will cooperate with our sale." She also clarified that Kant did not need to issue a written opinion, rather "[w]e just need him to verbally say #1 & #2 above." Id., Ex. J.

- On October 31, 2006, Jason Bunin, another Bear Stearns representative wrote to plaintiffs, Robert Kenney, and Shelley Bergman, saying, "Kant is in avoidance phase and not taking our call for the past two days. This is not an ideal situation given what you want to do quickly. We also understand that Kant is leaving for China for two weeks Friday." Id., Ex. K.

Following this volley of emails, Kant apparently went on a trip to China for two weeks.

Id., Ex. P, Kant Dep. 128.[2] The parties agree that the private sale to Bear Stearns was not completed in October or November of 2006. See Def. Facts ¶ 21; Pls. Facts ¶ 21.

In December 2006, email communications regarding the proposed private sale to Bear Stearns resumed:

- On December 20, 2006, Srour wrote to Kant: "As I have just discussed with you, I have attached private sale documents in connection with the private sale by the following individuals of shares of MarineMax, Inc. to Bear Stearns: . . . . These shares were initially owned by Chrisbar Enterprises . . . and will be transferred to the above individuals. Please note these shares include the 'escrow' shares. We have been told that these shares have been released from escrow and also were issued March 31, 2006." Kant Decl., Ex. F.

- On December 26, 2006, Kant wrote to Srour: "Toni. I generally have two problems with the documentation: First, you would like our opinion on this transaction and instructions by MarineMax to its transfer agent. In order to do that, Greenberg Traurig and MarineMax, Inc. would have to be given the right by Bear Stearns to rely upon the Bear Stearns letter to the sellers. We would also point out that MarineMax is approaching the end of its quarter and has a closed trading window. As a result, Bear Stearns would have to inform our firm and MarineMax that it has taken whatever steps it deems appropriate to assure itself that none of the sellers is in possession of material non-public information regarding MarineMax. We do point out that none of the sellers is an executive officer at MarineMax, but one of them does hold an important position with MarineMax. Other than that, you should be fine to proceed." Id.

---

[2]Kant could not recall whether he went to China in November 2006 or January 2007.

- On December 27, 2006, Srour responded to Kant and attached revised private sale documents.  Id., Ex. G.

- On December 28, 2006, Srour again wrote to Kant attaching revised documents and stating, "We have revised rep #5 in the sales agreement."  The December 28 email further stated, "We believe all concerns have been adequately dealt with."  Id., Ex H.

- On January 4, 2007, Kant wrote to Srour: "The documents are ok, and you can proceed as far as MarineMax is concerned to the extent you have done all due diligence you believe is required."  Kant Decl. ¶ 32.[3]

It is undisputed that despite ultimately receiving Kant's approval, plaintiffs did not

complete the private stock sale to Bear Stearns.  Def. Facts ¶ 28; accord Pls. Facts ¶ 28.

IV.     *Re-registration of Stock in Individual Plaintiffs' Names*

Following the correspondence regarding the Bear Stearns sale, the following

communication between Kant and plaintiffs' representatives took place:

- On January 10, 2007, Srour contacted Kant requesting that the stock held in the corporate name of Chrisbar be transferred into plaintiffs' individual names.  Def. Facts ¶ 29; Deubert Decl., Ex. M; Kant Decl., Ex. J.  Kant sent Srour an email that same day saying he would be traveling for the next two weeks.  Deubert Decl., Ex. M.

- On January 25, 2007, Srour wrote to Kant, "The transfer agent has informed us that an opinion from you is required in connection with the distributions."  Id.  Kant replied that day that he needed "a formal request from the transfer agent with the facts involved."  Id.; Kant Decl., Ex. K; accord Def. Facts ¶ 31.

- Srour emailed Kant the next day saying:

    I have asked our Legal Transfer Department to once again send the stock certificates to the transfer agent and to also ask the transfer agent to contact you.

    As we both know, the transfer agent will only act on your instructions and we are not sure if the Transfer Agent will call.

---

[3]The January 4, 2007 email is not annexed to Kant's declaration, but he quotes it and plaintiffs do not dispute that the email was sent.  See Pls. Facts ¶ 27.

> Since the relationship is with you, and not with us, we would appreciate it if you would call your representative on Monday to discuss what you must provide to your transfer agent.

Deubert Decl., Ex. M; Kant Decl., Ex. K.

- On January 29, 2007, Robert Kenney wrote to Kant asking him to "giv[e] this matter the brief time needed to authorize the re-registration of these Marine Max [sic] shares." Kant Decl., Ex. L. Kant replied later that day, "I never received anything from the transfer agent." Id.

- Robert Kenney wrote again to Kant on February 1, 2007, stating, "I'm being told that the transfer agent has tried to contact you on numerous occasions since Monday, January 29th." Id. Kant responded, "I have received nothing in writing from the transfer agent. They have not tried to contact me numerous times. I want a WRITTEN request." Id.

- Srour attempted to reach Kant by phone later that day, but Kant was unavailable to take her call. Deubert Decl., Ex. N. Kant then wrote to Srour later on February 1, 2007:

  > Toni, I do not represent your clients. It is an intrusion to get calls or other correspondence from you and your clients relative to their desired transfer of their stock. You are a professional. You know what I need to render an opinion. Get that to me and a written request from the transfer agent, and I will render the opinion.

  Id., Ex. O. Robert Kenney wrote to Matthew and Paul Barbara the same day urging them to ask McGill or McLamb to call Kant. Id.

- By February 22, 2007, the registered stock was re-registered from Chrisbar to the individual plaintiffs' names, Def. Facts ¶ 35, and on February 26, Robert Kenney wrote to plaintiffs: "OK! The stock has been re-registered in your individual names," Eakins Decl. Ex. 6. Plaintiffs were subsequently issued stock bearing the restrictive legend. Def. Facts ¶¶ 36, 38.

V.    *Passage of One-Year Anniversary and Indemnification Dispute*

On April 1, 2007, one year had passed since the execution of the APA, and it is

undisputed that, at that point, none of the plaintiffs sold their MarineMax stock. The

circumstances surrounding the one-year anniversary will be discussed in detail below.

Meanwhile, following the execution of the APA and transfer of assets, the parties got into a dispute regarding the allocation of certain funds, see Def. Facts ¶ 51; Pls. Facts ¶ 51., the details of which are immaterial here.  What is relevant to this case is that defendant ultimately brought suit against plaintiffs in this district regarding these funds just before the one-year anniversary of the APA.  See MarineMax of N.Y., Inc. v. Chrisbar Enter. I., Inc., No. 07-CV-1333 (E.D.N.Y. Mar. 29, 2007).  Kant's firm, Greenberg Traurig, represented MarineMax.  Eakins Decl., Ex. 14.  The case was resolved through a settlement agreement in June 2007.  Id., Ex. 18.

In an email sent to the Barbara family on June 18, 2007, Robert Kenney explained that the settlement "will trigger the 100,000 shares of escrow stock being delivered."  Id. Ex. 16.[4] Robert Kenney added that the escrow shares were still in their second year of restriction, meaning that an opinion from Kant would be required in order to sell the shares.  Id.  On June 20, McGill emailed Kant saying, "The opinion on the stock is costing us daily in interest so we need to get that part done asap."  Def. Facts ¶ 59; Kant Decl., Ex. M.  Kant replied, "I called the lady back yesterday and told her no problem and that we would issue the opinion as soon as the stock was sold."  Kant Decl., Ex. M.  McGill then forwarded Kant's message to Paul Barbara with a message saying, "You should be all set with the stock as Bob Kant has spoken to your banker."  Id.  Robert Kenney emailed plaintiff Angela Chianese later that day and said, "Bob Kant has given his opinion related to your shares.  You are free to sell shares."  Eakins Decl., Ex. 17.  The record does not reveal whether Chianese sold any shares at that point, however, and

---

[4]Plaintiffs dispute that the pending suit caused the escrow shares not to be released, and instead assert – without factual support – that the escrow shares were not released due to MarineMax's failure to satisfy its obligations under the APA.  Pls. Facts ¶ 55.

plaintiffs deny that "any opinion letter was issued at that time for Angela Chianese." Pls.' Facts ¶ 60.

VI.    *2009 Sales*

Between August 3 and August 18, 2009, plaintiffs, through their broker, provided written representations requesting opinions of counsel from Greenberg Traurig that would permit the removal of stock restrictions under Rule 144. Def. Facts ¶ 72. Kant provided the requested opinion letters between August 12 and August 25, 2009. Id. ¶ 74; accord Pls.' Facts ¶ 74. Between August 2009 and January 2012, plaintiffs sold all of their MarineMax stock in public sales. Def. Facts ¶¶ 88-96.

VII.    *Commencement of Suit and Prior Rulings*

On January 26, 2012, plaintiffs filed suit against MarineMax, McGill, McLamb, and Aiello in this court. Dkt. #1. On February 8, 2012, plaintiffs filed an amended complaint adding Kant as a defendant and asserting twelve causes of action. Dkt. #2. Defendants moved to dismiss the amended complaint for failure to state a claim on May 29, 2012. Dkt. #22. On December 4, 2012, the court issued an Opinion and Order (hereinafter "Op. & Order") dismissing eleven of plaintiffs' claims. Dkt. #28. The court sustained plaintiffs' claim for breach of contract for failure to lift the stock restrictions on April 1, 2007, holding that plaintiffs had sufficiently alleged a plausible claim for breach of the Good Faith Efforts clause of the contract. Op. & Order 30-35. The court dismissed plaintiffs' claim of common law fraud without prejudice and granted leave to replead. Id. at 37-41. Plaintiffs thereafter filed a second amended complaint alleging new fraud claims against MarineMax, Kant, McGill, and McLamb.

Dkt. #31.[5]  Defendants filed a motion to dismiss the fraud claims on February 25, 2013, Dkt.

#45, which the court granted on March 5, 2013, dismissing Kant, McGill, and McLamb from the

case, Dkt. #52.  MarineMax filed an answer to the second amended complaint on March 21,

2013.  Dkt. #56.  Following a discovery process in which multiple orders of the magistrate judge

were appealed, Dkt. ## 43, 62, fact discovery was completed in June 2013, see Dkt. #69, at 1.

MarineMax now moves for summary judgment.  Dkt. #75.

## DISCUSSION

I.      *Legal Principles*

    a.      <u>Summary Judgment Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The function of the court is not to resolve disputed issues, but to determine

whether there is a genuine issue to be tried.  <u>See</u> <u>Anderson v. Liberty Lobby. Inc.</u>, 477 U.S. 242,

249 (1986).  "While genuineness runs to whether disputed factual issues can reasonably be

resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it

concerns facts that can affect the outcome under the applicable substantive law."  <u>McPherson v.</u>

<u>Coombe</u>, 174 F.3d 276, 280 (2d Cir. 1999) (quoting <u>Graham v. Henderson</u>, 89 F.3d 75, 79 (2d

Cir. 1996) (internal quotation marks and ellipses omitted)).

In assessing whether summary judgment is appropriate, the court considers "the

pleadings, depositions, answers to interrogatories and admissions on file, together with any other

---

[5]The court dismissed Aiello as a defendant in the December 2012 decision, Op. & Order
41, and plaintiffs did not allege any claim against him in their second amended complaint.

firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003) (internal quotation marks omitted)); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary judgment against it, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998); accord Celotex Corp., 477 U.S. at 324 (if moving party shows absence of a genuine issue of material fact, nonmoving party "must go beyond the pleadings" and identify facts that show a genuine issue for trial). In reviewing the record before it, "the court is required resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997) (citing Anderson, 477 U.S. at 255).

     b.     Breach of Contract

To recover on a breach of contract claim under New York law, a plaintiff must establish: "(1) the existence of a valid contract; (2) due performance by the plaintiff; (3) breach by the defendant; and (4) damages to [plaintiff] caused by the breach." DLJ Mortg. Capital Inc. v. Home Loan Corp., 667 F. Supp. 2d 368, 368 (S.D.N.Y. 2009). "Under New York law, contracts must be 'construed in accord with the parties' intent.'" Banco Multiple Santa Cruz, S.A. v. Moreno, 888 F. Supp. 2d 356, 364 (E.D.N.Y. 2012) (quoting Greenfield v. Philles Records, Inc.,

780 N.E.2d 166, 170 (N.Y. 2002)). "'[T]hat a specific promise has not been expressly stated does not always mean that it was not intended.'" Id. (alteration in original) (quoting Havel v. Kelsey–Hayes Co., 445 N.Y.S.2d 333, 335 (App. Div. 1981)).

      c.     <u>Covenant of Good Faith and Fair Dealing</u>

"'Under New York law, a covenant of good faith and fair dealing is implied in all contracts.'" <u>State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada</u>, 374 F.3d 158, 169 (2d Cir. 2004) (quoting <u>1-10 Indus. Assocs., LLC v. Trim Corp. of Am.</u>, 747 N.Y.S.2d 29, 31 (App. Div. 2002)). Plaintiffs' breach of contract claim arises not from the implied covenant, but from the express Good Faith Efforts clause of the APA. <u>See</u> Op. & Order 33. Nevertheless, as the court held in its March 5, 2013 order, Dkt. #52, because there is no contract provision defining "good faith," the term may be construed to have the same meaning it does in the implied covenant context. <u>See</u> 11 Samuel Williston & Richard A. Lord, <u>A Treatise on the Law of Contracts</u> § 31:1 (4th ed. 1993) ("[T]echnical terms and words of art are to be given their technical meaning when used in a transaction within their technical field, and by case law to the effect that when words or terms having a definite legal meaning and effect are knowingly used in a written contract, the parties will be presumed to have intended the words or terms to have their proper legal meaning and effect, <u>in the absence of any contrary intention appearing in the writing</u>."). The court accordingly looks to the case law regarding the implied covenant of good faith to interpret the meaning of the term, "good faith," in the contract. Case law interpreting the implied covenant is especially relevant here since, although the good faith obligation was explicitly stated in the APA, the agreement is silent on any obligation on the part of defendant to

lift restrictions on plaintiffs' stock.  Thus, a breach of contract claim premised on the failure to lift such restrictions must derive at least in part from obligations implicit in the contract.

The covenant of good faith and fair dealing provides that "neither party to the contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990).  "Integral to a finding of a breach of the . . . covenant is a party's action that directly violates an obligation that may be presumed to have been intended by the parties."  Id.  The covenant may "require affirmative steps to cooperate in achieving the contract's objective." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007) (internal quotation marks omitted).  However, any implied obligation must be consistent with the express terms of the contract.  See Dorset Indus., Inc. v. Unified Grocers, Inc., 893 F. Supp. 2d 395, 407 (E.D.N.Y. 2012); accord Sharma v. Skaarup Ship Mgmt. Corp., 699 F. Supp. 440, 449 (S.D.N.Y. 1988) ("[N]o term may be implied in a contract that conflicts with the express terms of the contract.").

Moreover, the covenant "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract."  M/A-COM Sec. Corp., 904 F.2d at 136 (internal quotation marks omitted); accord Suthers v. Amgen Inc., 441 F. Supp. 478, 485 (S.D.N.Y. 2006) (party does not violate the covenant of good faith and fair dealing solely "by acting in its own self-interest consistent with its rights under the contract"); see also Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1577 (2d Cir. 1994) ("[W]e can rely on the promoter's self-interest to ensure that the goal of profit maximization guides its business decisions.").  "'[E]ven after you have a signed

a contract, you are not obliged to become an altruist toward the other party and relax the terms if he gets into trouble in performing his side of the bargain.'" <u>Fasolino Foods Co. v. Banca Nazionale del Lavoro</u>, 961 F.2d 1052, 1057 (2d Cir. 1992) (alteration in original) (quoting <u>Mkt. St. Assocs. Ltd. P'ship v. Frey</u>, 941 F.2d 588, 594 (7th Cir. 1991)).

"[S]ince there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith." <u>Tractebel Energy Mktg.</u>, 487 F.3d at 98 (alteration in original) (internal quotation marks omitted). "In determining whether a party has breached the obligation or covenant of good faith and fair dealing, a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties." <u>Id.</u> (internal quotation marks omitted). Nevertheless, "the implied covenant of good faith will not be breached without some showing of intent to harm the other contracting party or a reckless disregard of it." <u>Paul v. Bank of Am. Corp.</u>, No. 09-CV-1932 (ENV)(JMA), 2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011); <u>accord</u> <u>Carvel Corp v. Diversified Mgmt. Grp. Inc.</u>, 930 F.2d 228, 230 (2d Cir. 1991) ("This covenant includes an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.") (internal quotation marks omitted). Plaintiffs thus face a substantial burden in showing that defendant breached its duty of good faith by failing to lift the stock restrictions.

 d. <u>Relevant Securities Regulations</u>

Section 5 of the 1933 Act generally prohibits the sale of unregistered securities. 15 U.S.C. § 77e. The Act and related regulations provide some exemptions from this prohibition.

Section 4 of the Act provides statutory exemptions to the general prohibition on the sale of unregistered securities, including "transactions by any person other than an issuer, underwriter, or dealer," id. § 77d(a)(1), and "transactions by an issuer not involving any public offering," id. § 77d(a)(2).

In addition, the Securities and Exchange Commission ("SEC") has promulgated rules providing a "safe harbor" from the requirements of § 5. See SEC v. Kern, 425 F.3d 143, 145 (2d Cir. 2005). Rule 144, in effect during the relevant period for this case,[6] permits certain public sales of "restricted securities," which the rule defines as "[s]ecurities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering." 17 C.F.R. § 230.144(a)(3)(i) (2006). An "'affiliate' of an issuer is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." Id. § 230.144(a)(1). Rule 144 provides a holding period before restricted securities can be sold of "one year . . . between the later of the date of the acquisition of the securities from the issuer or from an affiliate of the issuer, and any resale of such securities in reliance on this section for the account of either the acquiror or any subsequent holder of those securities." Id. § 230.144(d)(1). Following the one year holding period, the rule permits public sales, but imposes limitations on the amount of securities that may be sold, id. § 230.144(e)(2), manner of sale restrictions, id. § 230.144(f), and notice requirements (via filing a Form 144 with the SEC), id. § 230.144(h). Finally, the rule provides that the aforementioned restrictions shall not apply to restricted

[6]Rule 144 was subject to significant amendments in 2008. See Revisions to Rules 144 & 145, 72 Fed. Reg. 71546-01 (Dec. 17, 2007).

securities sold for the account of a person who is not an affiliate of the issuer at the time of the sale and has not been an affiliate during the preceding three months, provided at least two years have elapsed since the date the securities were acquired.  Id. § 230.144(k).

A related rule, Rule 144A, permits private resales of securities by persons other than issuers or dealers to "qualified institutional buyers," which include investment companies, banks, and dealers that are registered pursuant to section 15 of the Exchange Act that own and invest securities over certain thresholds, see, e.g., 17 C.F.R. §§ 230.144A(a)(1)(i)(B), (ii), (vi), provided certain conditions are met.  Id. § 230.144A(b).  Among the conditions that must be met, however, is a requirement that "[t]he securities offered or sold . . . [w]ere not, when issued, of the same class as securities listed on a national securities exchange."  Id. § 230.144A(d)(3)(i).

II.    *Application*

a.    Consideration of Bear Stearns Sale

Before examining the evidence that discovery produced with respect to plaintiffs' breach of the covenant of good faith claim, the court pauses to address whether defendant's conduct with respect to the private sale to Bear Stearns is relevant to the instant motion.  The court's prior opinion and order held that the private sale of restricted stock to Bear Stearns was barred by 17 C.F.R. § 230.144A(d)(3)(i), which, as just discussed, permits the private resale of securities to qualified institutional buyers only where the securities offered or sold were not, when issued, of the same class as securities listed on a national securities exchange.  See Op. & Order 7.  The court consequently dismissed three causes of action relating to the private sale to Bear Stearns.  Id. at 8-9.  Plaintiffs continue to assert bad faith on the part of defendant, primarily through the actions of Kant, with respect to the proposed private sale.  See Pls.' Mem. of Law in

Opp'n to Def. MarineMax, Inc.'s Mot. for Summ. J. ("Pls.' Opp'n") 7-8; see also id. at 23-24.

Defendant argues that plaintiffs' allegations of bad faith with respect to this transaction "attempt

to muddy the waters," by focusing attention away from plaintiffs' lone surviving claim and urges

the court to disregard these allegations.  Reply Mem. of Law in Further Supp. of Def.'s Mot. for

Summ. J. ("Def.'s Reply") 11.

Neither party moved for reconsideration or reargument of the court's prior holding that

the proposed private sale was barred by Rule 144A.  It is clear, however, from the summary

judgment papers, that the parties were operating under the assumption that such a private sale

was lawful under certain circumstances, see, e.g., Deubert Decl., Ex. P, Kant Dep. 67, and Kant

ultimately approved the sale, Kant Decl. ¶ 32.  The court therefore requested supplemental

materials from plaintiffs, Dkt. #100, and conducted its own additional research in an effort to

determine whether its prior holding was, in fact, correct.

> Plaintiffs' expert report, annexed to the Eakins Declaration, asserts that
>
> private sales are possible in the secondary market in reliance on what has become
> known as the "4 1-½ Exemption."  The 4 1-½ Exemption is not specifically
> provided for in the Securities Act or any rules promulgated under the Securities
> Act, but rather has been established as the result of court decisions and SEC No-
> Action Letters pronouncements [sic] and is a hybrid rule based on the exemptions
> in sections 4(1) and 4(2) of the Securities Act.

Eakins Decl., Ex. 38, ¶ 42.  As mentioned above, §§ 4(1) and 4(2) of the 1933 Act exempt

"transactions by any person other than an issuer, underwriter, or dealer" and "transactions by an

issuer not involving any public offering," from the Act's registration requirements.  15 U.S.C. §§

77d(a)(1)-(2).  It is clear from the examples of judicial and SEC decisions provided by plaintiffs,

Dkt. #101, and other decisions uncovered by the court that the SEC has acknowledged the

"possible availability" of the 4 1-½ Exemption "in appropriate circumstances," Optelecom, Inc.,

SEC No-Action Letter, 1982 WL 30378 (Apr. 5, 1982), and courts have "assum[ed] that the law recognizes [such] an implied exemption," <u>SEC v. Cavanagh</u>, No. 98 Civ. 1818DLC, 2004 WL 1594818, at *22 (S.D.N.Y. July 16, 2004). Nevertheless, it is not clear whether the 4 1-½ Exemption would apply in this case.

The 4 1-½ Exemption "basically allows <u>affiliates</u> to make private sales of securities held by them so long as some of the established criteria for sales under both Section 4(1) and Section 4(2) of the Act are satisfied." <u>Zacharias v. SEC</u>, 569 F.3d 458, 464 (D.C. Cir. 2009) (emphasis added) (internal quotation marks omitted). The court assumes, without deciding, that the exemption would apply to plaintiffs despite the fact that they disclaimed affiliate status. <u>See</u> Kant Decl., Ex. E. However, since the 4 1-½ Exemption "falls between the cracks of the Sections 4(1) and 4(2) exemptions," <u>Cavanagh</u>, 2004 WL 1594818, at *22, it has been held <u>not</u> to apply when the express terms of the statutory exemptions exclude a particular transaction. <u>See</u> <u>Zacharias</u>, 569 F.3d at 464 ("[I]f an underwriter is present, the § 4(1) exemption, and by extension the 4(1 ½) exemption, cannot apply.") (citing <u>Kern</u>, 425 F.3d at 152); <u>see also</u> <u>Ackerberg v. Johnson</u>, 892 F.2d 1328, 1335 n.6 (8th Cir. 1989) ("While the term '§ 4(1 1/2) exemption' has been used in the secondary literature, the term does not properly refer to an exemption other than § 4(1). Rather the term merely expresses the statutory relationship between § 4(1) and § 4(2).") (internal citations omitted).

In <u>SEC v. Kern</u>, the Second Circuit analyzed under § 4(1) a private sale of unregistered securities by Kern, the seller of the securities, to Lybrand, the buyer. 425 F.3d at 152. The district court had held that Kern was an "underwriter" as defined by the 1933 Act, <u>see</u> 15 U.S.C. 77b(a)(11) ("The term 'underwriter' means any person who has purchased from an issuer with a

view to, or offers or sells for an issuer in connection with, the distribution of any security . . . ."),

and therefore the § 4(1) exemption did not apply.  Id.  Kern argued he was not an underwriter.

Id.  The Circuit held:

> Our analysis tracks the arguments of neither the district court nor Kern.  Section 4(1) exempts "transactions by any person other than an issuer, underwriter or dealer."  Thus, if any person involved in a transaction is a statutory underwriter, then none of the persons involved may claim exemption under Section 4(1). . . .  There is no question that the 1998 sales involved underwriters; indeed, this has been effectively conceded by the Sellers' failure to argue that the 1998 sales did not violate Section 5.  Even ignoring this concession, the profitability of Lybrand's scheme was based on the sale of securities to the public once the price had been manipulated upwards, so that the entities controlled by Lybrand acquired securities from affiliates with a view to distribution, and were therefore underwriters. As a result, the entire "transaction" is placed outside the Section 4(1) exemption.

Id. (internal citations omitted).  Here, the court understands plaintiffs' citation to the 4 1-½

Exemption to be an argument that plaintiffs were not underwriters.  Again, the court assumes,

without deciding, that this is the case.  However, Bear Stearns was "a registered broker-dealer,"

In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 445

(S.D.N.Y. 2011),[7] and the Second Circuit has held that a company "registered as a securities

broker-dealer with the [SEC]" is "[c]learly . . . a dealer," for purposes of § 4(1).  Byrnes v.

Faulkner, Dawkins & Sullivan, 550 F.2d 1303, 1311 (2d Cir. 1977).  There is no indication in

the Kern decision that the Circuit's holding that § 4(1) applies to "transactions," rather than

"persons," 425 F.3d at 152, is limited to situations in which one of the persons involved in the

transaction is an underwriter.  Because the transaction at issue in this case involved a "dealer," it

---

[7]The court assumes that a number of different entities had "Bear Stearns" as part of their names, and that not all these entities were necessarily registered as broker-dealers.  However, the parties refer generically to "Bear Stearns," so the court does not have any way to determine whether plaintiffs' accounts were housed in an entity that was not registered as a broker-dealer.

is not clear to the court that § 4(1) would apply, and therefore, by extension, the 4 1-½ Exemption would apply.  See Zacharias, 569 F.3d at 464; but see Gilligan, Will & Co. v. SEC, 267 F.2d 461, 463 (2d Cir. 1959) (determining whether broker-dealer was an underwriter for purposes of § 4(1)).

The court need not decide this issue, however.  Were the court to reconsider its prior ruling, it would reinstate plaintiffs' claim for breach of contract with respect to defendant's alleged bad faith in the Bear Stearns sale.[8]  But it is not necessary to reinstate this cause of action in order to consider facts pertaining to the Bear Stearns sale.  These facts are relevant in any case as evidence of the parties' course of conduct to prove plaintiffs' claim of breach of the Good Faith Efforts clause for failure to lift the stock restrictions.  See Tractebel Energy Mktg., 487 F.3d at 98 ("In determining whether a party has breached the obligation or covenant of good faith and fair dealing, a court must examine . . . any course of performance or course of dealing that may exist between the parties.") (internal quotation marks omitted).   Accordingly, the court does not decide whether the proposed private sale to Bear Stearns would have been permitted under the 4 1-½ Exemption, but nevertheless considers evidence related to the Bear Stearns sale in analyzing whether a material issue of fact exists as to any breach of the duty of good faith and fair dealing by defendant.  As the proposed private sale is the first transaction in which plaintiffs charge bad faith, the court now turns to that analysis.

---

[8]The court would not reconsider plaintiffs' causes of action for breach of fiduciary duty and tortious interference with contract related to the Bear Stearns sale.  See Op. & Order 8-9. These causes of action would still be dismissed for the same reasons articulated in the court's dismissal of the breach of fiduciary duty and tortious interference claims related to the failure to lift the stock restrictions.  Id. at 14-20, 36-37.

b. <u>Evidence of Breach of the Covenant of Good Faith and Fair Dealing</u>

1. Bear Stearns Sale

Plaintiffs argue that Kant failed to respond to the October 23, 2006 email from Srour, that he ignored multiple phone calls from Bear Stearns employees following that email, and that his "refusal to cooperate . . . continued throughout November 2006." Pls.' Opp'n 8. In December 2006, Srour made an additional attempt to contact Kant who, according to plaintiffs, "continued to ignore Plaintiffs and Bear Stearns." <u>Id.</u> "By the time Kant seemingly approved the transaction," say plaintiffs, "the advantages to the Barbaras of engaging in the private sale had been greatly reduced." <u>Id.</u> The reason for this, plaintiffs assert, is that "[t]he one-year holding period was set to expire on April 1, 2007, and . . . Kant's delay had already compromised the value of a private sale due to the discounted value of the transaction combined with market factors." <u>Id.</u>

The record does not support plaintiffs' allegations of Kant's obstructionism. Emails produced in discovery show that when she sent the October 23, 2006 request, Srour had already been in contact with Kant. <u>See</u> Deubert Decl., Ex. F. ("As we just discussed . . . ."). The record shows that Kant was then out of contact with Bear Stearns until October 31, 2006 – a period of six business days. Plaintiffs state that Kant's refusal to cooperate "continued throughout November 2006." Pls.' Opp'n 8. But the only evidence in the record about November 2006 is that Kant was in China for two weeks during that month. Deubert Decl., Ex. P, Kant Dep. 128. The record contains no evidence that Bear Stearns or plaintiffs attempted to contact Kant in November 2006 or most of December 2006. The correspondence between Srour and Kant resumed on December 20, 2006 and again indicates that Srour and Kant had been

communicating off-line.  See Kant Decl., Ex. F ("As I [Srour] have just discussed with you [Kant] . . . ."); see also Deubert Decl., Ex. P, Kant Dep. 102-03 ("Q: How did you communicate . . . to Ms. Srour?  A: I think over the telephone.").  The next communication in the record is Kant responding to Srour, requesting two changes to the private sale documentation, and stating, "other than that, you should be fine to proceed."  Kant Decl., Ex. F.  It is undisputed that after Srour made the changes Kant requested, he told her, "The documents are ok, and you can proceed."  Kant Decl. ¶ 32; accord Pls. Facts ¶ 27.  The evidence in the record therefore shows that Kant did not respond to Bear Stearns' emails for a period of six business days, after which he went on vacation, and once communications resumed, he quickly provided the "verbal agreement" that Bear Stearns needed.  See Deubert Decl., Ex. F.

Plaintiffs attempt to embellish the picture of Kant's bad faith behavior by stating that "Matthew Barbara left several telephone messages for Kant around this time," which Kant did not return, Pls. Facts ¶ 137, and that "Kant's refusal to respond to Bear Stearns' communications forced Paul Barbara and Matthew Barbara . . .  to request McGill and McLamb to contact Kant," id. ¶ 136.  These statements find some support in the record, but do not significantly alter the picture drawn above.  Matthew Barbara testified that he called Kant "once or twice" during October 2006 and did not receive a return call.  Deubert Decl., Ex. L, Matthew Barbara Dep. 77-79.  He did not recall, however, if he mentioned this to McGill or McLamb.  Id. at 80-81.  McGill testified that he received "two calls from Matthew and Paul saying -- you know, asking to get Bob Kant to move forward."  Id., Ex. A, McGill Dep. 285.  McGill responded by telling the Barbaras "that I had spoken with [Kant], and, you know, Bear Stearns needed to do what they needed to do and he'd move forward."  Id.  McLamb testified that he remembered "some

frustration around getting ahold of Mr. Kant" on the part of Matthew Barbara, id., Ex. B, McLamb Dep. 193, but this statement was related to discussions McLamb had with Matthew Barbara after "December of '06, January of '07, id. at 192 – in other words, after Kant had already approved the private sale to Bear Stearns.[9]  To the extent plaintiffs made additional contacts beyond Bear Stearns' efforts, these amounted to one or two unreturned phone calls to Kant and communication with McGill, who spoke to Kant on plaintiffs' behalf and reported that they could move forward.  The course of dealing that appears in the record thus fails to support plaintiffs' allegation that Kant acted in bad faith with respect to the Bear Stearns sale.  Kant may not have responded to Bear Stearns' emails immediately, but he ultimately approved the private sale once Srour provided all the information he requested.

Plaintiffs state that "[b]y the time that Kant finally acted, the advantages to the Family of engaging in the private sale had been greatly reduced."  Decl. of Matthew Barbara ¶ 29; Decl. of Paul Barbara ¶ 26.  Plaintiffs provide no supporting evidence regarding any reduction in advantages, so this statement is merely conclusory.  See Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.").  But even if plaintiffs did lose the advantage of receiving a higher price for their stock by getting approval of the private sale in January rather than October, any such harm is irrelevant in the absence of record evidence of defendant's bad faith.  See M/A-

---

[9]Plaintiffs cite additional portions of the record to support their assertion that the Barbaras were forced to contact McGill and McLamb, see Pls. Facts ¶ 136, but these record cites all relate to matters other than the Bear Stearns sale.  See, e.g., Robert Kenney Decl. ¶ 25 (discussing Paul and Matthew Barbara's contacts with McGill and McLamb regarding lifting stock restrictions); Paul Barbara Decl. ¶ 32 ("I telephoned McGill to request his assistance . . . in getting our stock restrictions lifted."); Matthew Barbara Decl. ¶ 36 (call to McLamb on February 5, 2007 regarding transfer of shares into plaintiffs' individual accounts).

COM Sec. Corp., 904 F.2d at 136 (covenant of good faith does not prohibit one party from acting in a way "that may incidentally lessen the other party's anticipated fruits from the contract") (internal quotation marks omitted). Moreover, plaintiffs state that they ultimately decided to abandon the private sale to Bear Stearns because "the one-year holding period was set to expire on April 1, 2007, and we would then be able to proceed with a public sale, which presented greater financial advantage." Decl. of Matthew Barbara ¶ 29; Decl. of Paul Barbara ¶ 26. This statement shows that plaintiffs guessed that between January and April the stock price would remain steady or go up – or at least would not go down enough to offset the advantage of not having to sell at a discount from the market price. Based on this guess, they made a calculated judgment to hold their stock and sell publicly, rather than sell privately at a discount to Bear Stearns. The fact that plaintiffs' gamble turned out to be wrong, and the stock price decreased further before April,[10] illustrates the difficulty in attempting to predict whether a stock will go up or down. It does not establish any bad faith on the part of defendant.

The record evidence regarding the Bear Stearns sale thus fails to support an inference that Kant acted in bad faith. The undisputed facts establish merely that Kant did not respond to plaintiffs' request for six business days; he did not respond during a period that he was on vacation and plaintiffs were not making further attempts to contact him; the transaction was ultimately approved when Kant received the necessary factual information; and plaintiffs decided not to proceed because they wagered they could make more money later in a public sale than in an immediate but discounted private sale. This record does not support plaintiffs'

---

[10]The court takes judicial notice of a well-publicized stock price. See Ganino v. Citizens Utilities Co., 228 F.3d 154, 166 n.8 (2d Cir. 2000).

contention that a genuine issue of material fact exists as to whether defendant's actions with respect to the Bear Stearns sale breached the duty of good faith and fair dealing.

2.      Transfer of Shares to Plaintiffs' Individual Accounts

Plaintiffs next complain about Kant's behavior during their attempts to transfer MarineMax shares from their jointly-held Chrisbar account to their individual accounts. Although plaintiffs do not argue that this episode in itself constituted a breach of the contract, they characterize the transaction as important because, according to plaintiffs, it was "the first step in the process" of selling their stock on the open market following the one-year holding period. Pls.' Opp'n 9. Plaintiffs' complaint regarding this transaction is that Kant insisted that he needed a written request from the transfer agent in order to transfer shares into plaintiffs' individual accounts; a demand plaintiffs characterize as "entirely unreasonable." Pls.' Opp'n 19. They argue that Kant had "no conceivable reason" to make the request and that he did so "without explanation." Id.

This argument does not comport with the record. Although both Kant and an employee of the transfer agent testified that seeking a written request from the transfer agent was abnormal, see Deubert Decl., Ex. D., Vito Cirone Dep. 81; id., Ex. Q, Kant Dep. 248-50, Srour's January 25, 2007 email to Kant stated, "The transfer agent has informed us that an opinion from you is required in connection with the distributions." Kant Decl., Ex. K. In response, Kant testified that he sought a written memorialization of what he understood to be a request for an opinion from the transfer agent. See Deubert Decl., Ex. Q., Kant Dep. 247-48; accord id. at 263. The record evidence thus shows that the request from the transfer agent originated with Srour, plaintiffs' representative. Even so, Kant's purported reason for wanting a written request from

26

the transfer agent is beside the point. Taking all inferences in the light most favorable to plaintiffs, Kant's demand for a written request, even if unreasonable, does not amount to bad faith, since the record is clear that Kant <u>provided</u> the necessary opinion letter and plaintiffs' stock was transferred into their individual accounts well before April 1, 2007. <u>See</u> Eakins Decl. Ex. 6; Def. Facts ¶¶ 36, 38. Plaintiffs were therefore positioned to engage in a public sale upon the one-year anniversary of the APA, which was the earliest date they could sell based on the Rule 144 holding period. There is nothing in the record to support an inference that Kant's demand for a written request in any way "destroy[ed] or injur[ed]," <u>M/A-COM Sec. Corp.</u>, 904 F.2d at 136, plaintiffs' ability to receive the fruits of the bargain. To the contrary, Kant provided the opinion letter in a timely manner. Accordingly, no genuine issue exists as to whether defendant breached its duty of good faith with respect to the transfer of shares into plaintiffs' individual accounts.

3.    Lifting of Stock Restrictions on April 1, 2007

The heart of plaintiffs' breach of contract claim is that defendant – once again, primarily through Kant – refused or failed to lift the stock restrictions after the one-year anniversary of the APA had passed, thereby preventing plaintiffs from selling their stock publicly. <u>See generally</u> Pls.' Opp'n 19-26. It is undisputed that plaintiffs did not ultimately sell their stock until mid-2009, Def. Facts ¶¶ 89-96, at which point the stock price had fallen substantially, <u>see</u> Second Am. Compl. ¶ 4.[11] Despite these facts, the record reveals no genuine issue about whether defendant breached the duty of good faith by failing to lift the stock restrictions. This is because

_____

[11]Although defendant denied this allegation in its answer to the second amended complaint, Dkt. #56 ¶ 4, defendant has never contested that the value of MarineMax stock dropped substantially from April 2007 to April 2009.

the evidence is undisputed that plaintiffs never made a written request to have the restrictions lifted and never actually attempted to sell their stock. Both the contract and defendant's normal course of dealing mandated that any request to lift the stock restrictions be in writing. In addition, Kant required that there be a pending or proposed sale before he would issue an opinion letter, and the record evidence compels an inference that he had a good faith basis for this requirement. Accordingly, there is no evidence in the record that would support plaintiffs' claim that defendant failed or refused to lift the restrictions on plaintiffs' stock in bad faith. Instead, the record makes clear that plaintiffs' stock remained restricted and unsold due to their own inaction.

### A.  Plaintiffs Made No Written Request for an Opinion Letter

In their depositions, plaintiffs do not assert that they ever requested in writing an opinion letter permitting a public sale of their MarineMax stock at any time prior to 2009. Nor have plaintiffs produced any documentary evidence of a written request. Both the APA and defendant's normal course of dealing required that such a request be in writing.

The APA contained the following express term: "**Notices.**  All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing . . . ."  Eakins Decl., Ex. 2, at 41, APA § 11.3.  Plaintiffs argue that this provision of the contract is inapplicable to requests for lifting stock restrictions because no provision in the APA obligates plaintiffs to submit a written request specifically for that purpose.  Pls.' Opp'n 23. This argument is unpersuasive for two reasons: First, plaintiff's argument is contrary to the plain meaning of the contract, which includes the requirement for written requests in a section of "GENERAL" terms, Eakins Decl., Ex. 2., at 41 – in other words, applying generally to the entire

agreement – and the specific term itself applies to "[a]ll notices, requests, demands, and other communications," id., APA § 11.3 (emphasis added). Second, no explicit provision in the contract obligates defendant to do anything at all with respect to the stock restrictions once the restricted shares were transferred to plaintiffs. Plaintiffs' claim that defendant had a duty to assist them in removing the restrictions is based on an implied obligation derived from the Good Faith Efforts clause of the contract. See Op. & Order 30-35. It is well settled, however, that "no term may be implied in a contract that conflicts with the express terms of the contract." Sharma, 699 F. Supp. at 449. Consequently, the Good Faith Efforts clause cannot be read to imply a promise by defendant to respond to a request that was not made in writing, since such a promise would conflict with the express terms of § 11.3. Whether or not defendant breached an implied duty to lift the restrictions from plaintiffs' stock (which is the question this litigation seeks to resolve), it cannot be disputed that plaintiffs were under an express contractual duty to request that the restrictions be lifted in writing.

In addition, the parties' course of dealing in the months leading up to the one-year anniversary of the APA made clear that all requests made to Kant needed to be in writing. Plaintiffs do not dispute that Kant needed certain factual information in order to opine that a particular sale met the requirements of Rule 144.[12] The record amply demonstrates that plaintiffs

_____

[12]Kant testified he sought "[an SEC] Form 144; a representation certificate from the seller, . . . and a . . . letter . . . from the seller's broker." Deubert Decl., Ex. P, Kant Dep. 139-40. In addition, Kant would frequently ask for a copy of the stock certificate to determine whether the holding period had expired. Id. If relevant, Kant also required additional information from persons who could be in possession of material non-public information. Id. at 140. Plaintiffs do not dispute the testimony that these were Kant's requirements or even that this information was necessary for him to render an opinion. They instead contend that there is no legal or regulatory requirement that the shareholder provide any representations, Pls. Facts ¶¶ 79, 81, but do not explain how else Kant was supposed to obtain the information.

were on notice that Kant required such factual information to be documented in writing. As previously described, plaintiffs had been involved in a consistent course of dealing with Kant starting in October 2006 in which he repeatedly emphasized his desire to have all requests be in writing. See, e.g., Kant Decl., Ex. F; id., Ex. K; id., Ex. L. Plaintiffs had no trouble complying with these demands in the period leading up to April 1, 2007, sending Kant multiple representation letters that included information about (1) the number of shares purported to be sold; (2) the seller's non-affiliate status; (3) the absence of any liens on the shares; (4) whether the seller purchased the shares with a view toward distribution; and (5) whether the seller was aware of any material non-public information. See Kant Decl., Exs. G, H. Moreover, after the April 1, 2007 date, plaintiffs sent Kant written requests and additional written documentation to transfer the escrow shares to plaintiffs' individual accounts. Id., Ex. N. Kant then provided the opinion letter. Id., Ex P. When plaintiffs ultimately sold their shares in 2009, they provided Kant with the necessary written documentation. Id., Ex. Q. Kant subsequently issued the opinion letters. Id., Exs. R-V. Based on this consistent course of dealing, plaintiffs were well aware of Kant's customary requirement that all requests be in writing.[13]

---

[13]The testimony of other MarineMax employees regarding sales of their own stock reinforces that the company's consistent course of dealing was to require written representations in order to obtain an opinion letter from Kant. McGill testified that when he sought to sell his shares, he provided Kant with SEC Form 10b-5 and Form 4 (though this sale was after the two year holding period, and thus governed by Rule 144(k)). See Deubert Decl., Ex. A, McGill Dep. 64-65. Similarly, when Michael Aiello and his partner sought to have restrictions lifted on their stock after a one-year holding period, they submitted written requests and representation letters. See id., Ex. E, Aiello Dep. 37-38; Kant Decl., Ex. B (March 3, 2000 letter concerning Robert Andreotta shares; March 10, 2000 letter concerning Michael Aiello shares). The Aiello sale is discussed in more detail below.

The record evidence is therefore undisputed that, based on the contract and defendant's consistent course of dealing, plaintiffs had to submit a written request to obtain an opinion letter from Kant. Plaintiffs argue in their opposition brief that they "sent more than a dozen written communications requesting [Kant] take actions necessary to remove the stock restrictions." Pls.' Opp'n 23. This argument, made without any citation to the record, misrepresents the facts. First, plaintiffs contradict their own argument by admitting defendant's statement that "[n]either Plaintiffs nor their brokers provided any written representation letters to MarineMax or its counsel at any time requesting an opinion of counsel." Compare Def. Facts ¶ 81 with Pls. Facts ¶ 81.[14] Second, as the court described in its review of the record, prior to 2009, all of plaintiffs' written communications to Kant concerned either the proposed private sale to Bear Stearns or the transfer of shares to plaintiffs' individual accounts. Plaintiffs argue that the latter request was "part of the process of having the restrictions lifted." Pls.' Opp'n 19. Even assuming that is the case, the request to transfer the shares to individual accounts was made in January 2007 – before a public sale could legally take place – and makes no mention of having the stock restrictions lifted at that point or in the future. See Kant Decl., Ex. J. Contrary to plaintiff's argument, the record contains no evidence that plaintiffs sent Kant any written request to lift the stock restrictions between April 1, 2007 and mid-2009.[15]

---

[14]Plaintiffs deny this statement only insofar as they assert that "[a] holder of restricted stock is . . . not required by law or regulation to make any representations to the issuer's counsel." Pls. Facts ¶ 78 (citing Rule 144). But the fact that Rule 144 does not mandate any particular procedure does not suggest any bad faith in the mutual contractual requirement that all requests be in writing.

[15]Plaintiffs also repeatedly invoke oral communications Matthew and Paul Barbara had with McGill and McLamb about Kant. See, e.g., Deubert Decl., Ex. L, Matthew Barbara Dep. 124; id., Ex. T, Paul Barbara Dep. 142. These oral communications with individuals other than

B.      Plaintiffs Never Attempted to Sell Stock

The record also contains no indication that plaintiffs actually attempted to sell their stock after the one-year anniversary of the APA arrived until 2009.  At best, the evidence shows that plaintiffs made attempts to get Kant to issue a prospective or "blanket" opinion that they could sell.  See Eakins Decl., Ex. 16.  Kant testified, however, that it was not his practice to give an opinion "as to the future," Deubert Decl., Ex. P, Kant Dep. 143, and he "certainly would not give a prospective opinion regarding restricted securities between one and two years," id., Ex. Q, Kant Dep. 235.  Instead, Kant required a pending sale with representations from the seller and broker, and an SEC Form 144 before he would issue an opinion letter.  See id., Ex. P, Kant Dep. 144 ("If the Barbaras sold – actually sold the stock during that period of time and delivered . . . a seller's certificate, a broker's certificate, and a 144, we would have been happy to give a legal opinion that their stock could be transferred to the buyer in a 144 transaction.") (emphasis added).  Kant testified that he could not think of any exception to this requirement.  Id. at 156.

Nothing in the record suggests that there was any bad faith involved in Kant's requiring that there be a pending sale in order for him to issue an opinion letter.  To the contrary, given that Kant was charged with policing sales of restricted MarineMax stock, the record compels a finding that the pending sale requirement was a good faith effort to ensure compliance with Rule 144.  As discussed above, Rule 144 imposes manner of sale and volume restrictions, as well as notice requirements, on sales of restricted stock.  17 C.F.R. §§ 230.144(e)-(f), (h).  Further, if there is a possibility that two or more persons selling restricted stock are acting in concert, Rule

Kant do not substitute for the required written request.  Moreover, a number of these communications took place before April 1, 2007.  See Matthew Barbara Decl. ¶¶ 36-40 (contacts in February 2007); Paul Barbara ¶¶ 32-35 (same).

144(e)(3)(vi) requires that all securities of the same class sold within a three-month period be aggregated for the purpose of determining the limitation on the amount of stock that may be sold. Plaintiffs have presented no evidence explaining how Kant could ensure compliance with these limitations through a prospective opinion.[16]  Prior to a pending sale, Kant could not know how many shares were being sold, the manner of their sale, and whether the proper form had been filed with the SEC.  Requiring a pending sale for stock still subject to Rule 144 was therefore a legitimate way of making sure Kant had the factual basis necessary to render an opinion.  Indeed, Kant stated that he deviated from this policy and issued a prospective opinion only when restricted stock had been held for more than two years because, "once met, the conditions to Rule 144(k) (i.e. the two year holding period and non-affiliate status) are highly unlikely to change."  Kant Decl. ¶ 27.  The record therefore fails to support an inference that Kant's requirement of a pending sale was anything other than a good faith attempt to ensure compliance with the requirements of Rule 144.

Plaintiffs also argue that Kant's failure to issue an opinion letter in the absence of a pending or proposed sale was in bad faith because he knew that the request to transfer stock into

---

[16]Plaintiffs argue that Kant could have relied on their previous representations, submitted during the proposed private sale.  Pls.' Opp'n 18.  Besides the date of acquisition of the shares, the only portion of these representations that would arguably carry over to subsequent sales is the statement that plaintiffs were not affiliates.  See Kant Decl., Ex. G.  Under the current version of Rule 144, volume limitations are imposed only on sales by affiliates, but this was not the case prior to the 2008 amendments, when Rule 144 imposed volume limitations on both affiliates and non-affiliates.  Compare 17 C.F.R. § 230.144(e) (2013) with 17 C.F.R. § 230.144(e) (2007).  So plaintiffs' prior representations did not provide a factual basis for Kant to approve a public sale.  Plaintiffs also argue, based on their unsworn expert report, that a sale of their total collective holdings would have complied with Rule 144's volume restrictions.  Id. at 23 n.11 (citing Eakins Decl., Ex. 38, ¶ 75).  Even if Kant could have inferred this, however, he still would need additional information to determine whether a pending public sale complied with the manner of sale and notice requirements.

plaintiffs' individual accounts was the first step in an effort to sell the stock publicly. Pls.'
Opp'n 9. This argument is unavailing. Kant acknowledged that he became aware that the
Barbaras were attempting to lift the restrictions on their shares through correspondence with
Srour in January 2007 about transferring the restricted stock to plaintiffs' individual accounts.
Deubert Decl., Ex. Q, Kant Dep. 239-40. Drawing all inferences in favor of plaintiffs, the court
may presume that Kant was on notice that plaintiffs intended to sell their shares after the holding
period expired. But even if Kant knew that plaintiffs intended, as a general matter, to sell their
shares, there is no indication in the record that he was aware of when they wanted to sell, how
many shares they wanted to sell, or any other details that would provide a factual basis for
issuing an opinion letter. Nor is there any indication in the record that plaintiffs took any steps
to provide Kant with these facts and move forward with a public sale. See Deubert Decl., Ex. Q,
Kant Dep. 283-84 (Kant recalling his understanding that plaintiffs had a "desire" to sell their
shares, but adding, "I don't recall any actions taken by them to effectuate that desire").[17] When
Kant became aware of plaintiffs' intentions in January 2007, he was of course barred from lifting
the stock restrictions by Rule 144's holding period. After April 1, 2007, Kant could not opine
that a sale comported with Rule 144 without factual details about the sale he was being asked to
approve. Accordingly, the record does not permit an inference that Kant's failure to issue an
opinion letter was in bad faith based solely on his knowledge of plaintiffs' general intentions. If

---

[17]Plaintiffs similarly took no concrete steps in the months following the one-year
anniversary. This fact is supported both by plaintiffs' testimony, see Deubert Decl., Ex. T, Paul
Barbara Dep. 115-17, 142; Eakins Decl., Ex. 32, Chianese Dep. 45-46, and by an email from
Melissa Medina of Bear Stearns in September 2007 asking Kant to transfer the 100,000 escrow
shares into plaintiffs' individual accounts "with legend," Kant Decl., Ex. N (emphasis added); in
other words, with the restrictions still in place.

anything, plaintiffs' argument further underscores the good faith basis for requiring a pending sale in order for Kant to issue an opinion letter.

Unable to argue from the evidence that Kant actually refused or failed to lift the stock restrictions in response to a pending sale, plaintiffs now argue that Kant failed to provide assurances that he would issue an opinion letter if requested. Pls.' Opp'n 23-24. This argument is unavailing. Plaintiffs state that "[p]rior to a sale being contemplated or consummated, it is expected and customary for the issuer's counsel to provide assurances that <u>if the requirements of Rule 144 are met</u>, the issuer will provide the Opinion Letter." Pls. Facts. ¶ 165 (emphasis added). Nothing in the record indicates that Kant refused to provide such assurances or that he would not have issued the opinion letter "if the requirements of Rule 144 [were] met." <u>Id.</u> To the contrary, the record shows that McGill contacted Kant on behalf of Paul Barbara on June 20, 2007, and Kant responded, "I called the lady back yesterday and told her no problem and that we would issue the opinion as soon as the stock was sold." Kant Decl., Ex. M. Kant also evidently gave a similar assurance with respect to Angela Chianese's shares, as exhibited by Robert Kenney's June 20, 2007 email to Chianese informing her that she was free to sell. <u>See</u> Eakins Decl., Ex. 17. It is not clear what more plaintiffs wanted in terms of "assurances," other than a prospective opinion that <u>any</u> sale by plaintiffs would comply with under Rule 144. Plaintiffs' statement of material facts indicates that is precisely what plaintiffs had in mind. <u>See</u> Pls.' Facts ¶ 166 ("Plaintiffs' representatives sought assurances from Kant that Plaintiffs satisfied the requirements of Rule 144 and Kant would provide an opinion letter . . . ."). But, as just discussed, Kant was not under any good faith obligation to provide such a prospective, "blanket"

opinion.[18]  Moreover, the court notes that plaintiffs' argument throughout this litigation – that

defendant in bad faith refused to lift the stock restrictions – appears to have shifted to an

argument that Kant merely failed to provide "assurances."  Plaintiffs' watered-down theory of

breach essentially concedes an absence of evidence in support of their case.

The record evidence demonstrates that plaintiffs never made a written request to Kant

and never attempted to sell their MarineMax stock publicly prior to 2009.  These undisputed

facts establish that defendant did not breach its duty of good faith by preventing plaintiffs from

selling their stock – defendant did not prevent plaintiffs from selling their stock at all.[19]

C.    The Record is Bereft of Evidence that Defendant "Intentionally
and Purposely" Breached the Covenant of Good Faith

In addition to the absence of evidence of any bad faith acts on the part of defendant, the

record does not support an inference that defendant intentionally and purposely breached the

duty of good faith.  The covenant of good faith and fair dealing has been described as "an

---

[18]Plaintiffs argue they did not have sufficient funds in their Bear Stearns accounts to cover the risk of proceeding with the restricted sale without assurances from Kant.  See Pls.' Opp'n 14-15 & n.8.  But, as just discussed, Kant did provide assurances.  Furthermore, plaintiffs cannot blame defendant for the lack of adequate capital other than MarineMax holdings in their Bear Stearns accounts.

[19]Defendant also highlights testimony indicating that plaintiffs chose not to sell their shares on or after April 1, 2007 because the stock price was too low, not because of any action of defendant.  Mem. of Law in Supp. of Def.'s Mot. for Summ. J. 10-12.  Although the record contains consistent testimony by four witnesses that plaintiffs abandoned their efforts to sell their stock after the price went down, the depositions differ on whether plaintiffs made this decision in April 2007, see Eakins Decl., Ex. 34, Robert Kenney Dep. 176; id., Ex. 35, Bergman Dep. 93-94, 96, or in June 2007, see Deubert Decl., Ex. T, Paul Barbara Dep. 115-17, 142; Eakins Decl., Ex. 32, Chianese Dep. 45-46.  Because of this discrepancy, the court cannot say that there is no disputed issue as to why plaintiffs chose not to sell between April and June 2007.  Nevertheless, because the record contains no evidence to support an inference that defendant acted in bad faith, this issue is immaterial.

implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part." Carvel Corp., 930 F.2d at 230 (internal quotation marks omitted). Accordingly, the covenant "will not be breached without

some showing of intent to harm the other contracting party or a reckless disregard of it." Paul, 2011 WL 684083, at *6. Plaintiffs' theory throughout this litigation has been that MarineMax prevented plaintiffs from selling their stock so that McGill and McLamb could sell their own shares while the stock price was high. See, e.g., Am. Compl. ¶¶ 44-45, 68-75. In the face of alternative explanations from McGill and McLamb about why they sold their stock when they did, however, see Deubert Decl., Ex. A, McGill Dep. 54-60, 277; id., Ex. B, McLamb Dep. 137, plaintiffs have abandoned that theory and make no mention of it in their opposition brief.

Plaintiffs now argue that MarineMax's "[a]nimus," Pls.' Opp'n 5, toward plaintiffs is exhibited by Kant's remarks that the negotiations over the APA were strained, Pls. Facts ¶¶ 119-120, and that some other MarineMax officials "dislike" plaintiffs, id. ¶ 121. They argue that "[t]hroughout the entire process Kant was rude and obnoxious . . . and responded to efforts to obtain his assistance and cooperation in a nasty and curt manner." Id. at 19. They also argue that Kant's "[h]ostility" toward plaintiffs is exhibited by his rudeness to people other than plaintiffs, and the fact that he was "forced" to leave the MarineMax Board of Directors. Pls.' Opp'n 5.[20] These arguments fail to impress, especially in a large commercial transaction

---

[20]Paul Barbara also expressed his belief that Kant withheld the opinion letter because he was bitter about the settlement in the prior lawsuit over the escrow shares. Deubert Decl., Ex. T, Paul Barbara Dep. 121. But his response to questioning on this topic reveals the absence of evidentiary support for plaintiffs' theory of Kant's animus:

between sophisticated parties.  See Op. & Order 22-23 (noting plaintiffs were "sophisticated business people") (internal quotation marks omitted); see also Eakins Decl., Ex. 2, at 20, APA § 4.1(w)(ii) (representing plaintiffs' "knowledge and experience in financial and business matters").  Just as the covenant of good faith does not require one party to be an altruist toward the other, Fasolino Foods Co., 961 F.2d at 1057, it does not impose rules of etiquette.  Moreover, "[t]he principle of good faith constrains a party's actions, not a party's motives for those actions."  Gaia House Mezz LLC v. State St. Bank & Trust Co., 720 F.3d 84, 94 (2d Cir. 2013).  Since plaintiffs are unable to show that any of defendant's actions breached its duty of good faith and fair dealing, their arguments about animus and rudeness toward them (and other people) are irrelevant.

        D.       **Plaintiffs' Additional Arguments Fail to Establish a Breach of the Duty of Good Faith**

As discussed, the record evidence fails to raise an inference that defendant breached the Good Faith Efforts clause of the contract.  Plaintiffs make several additional arguments, none of which establishes bad faith on the part of defendant.

First, plaintiffs argue that MarineMax and Kant knew plaintiffs were planning to sell upon the one-year anniversary based on their demand for a one-year rather than two-year holding

---

Q:      [Y]ou mean that Mr. Kant was upset about the issue, the reconciliation
           issue and took it out on you by --
A:      Holding the opinion letter, absolutely.
Q:      Do you have any facts to support that?
A:      No.  Do I have any facts to support that theory, which is a theory?
Q:      Yes.
A:      Not to my knowledge at this time.

Id. at 121-22.

period during the APA negotiations.  Pls.' Opp'n 3-4.  As discussed, such knowledge is insufficient to obligate defendant to act in the absence of a written request.  In any case, plaintiffs' argument is contradicted by the record.  Paul Barbara testified that he had no intention of selling his stock upon the one-year anniversary of the APA; he merely wanted "the right to sell if I so chose."  Deubert Decl., Ex. T, Paul Barbara Dep. 30; accord id. at 31.  Matthew Barbara testified that, at the time of the closing, he did intend to sell his stock a year later, but he never communicated that intention to anyone at MarineMax.  Id., Ex. L, Matthew Barbara Dep. 59-60.  Consistent with plaintiffs' testimony, McGill and McLamb both testified that they were unaware that plaintiffs planned to sell on the one-year anniversary of the APA.  Id., Ex. A, McGill Dep. 208-09; id., Ex. B, McLamb Dep. 65-66.  The record therefore does not support plaintiffs' contention that defendant knew, at the time of the execution of the APA, that plaintiffs planned to sell their stock one year later, let alone that such knowledge imposed a duty on defendant to act.

Second, plaintiffs argue that defendant treated them differently than other MarineMax shareholders.  Pls.' Opp'n 25.  This argument fails because plaintiffs were not similarly situated to other shareholders.  The record reflects that plaintiffs attempted to engage in sales that no other shareholders attempted, and failed to submit written requests as other shareholders did. According to McGill, no other MarineMax shareholder from an acquired company attempted to sell their restricted shares in a private sale prior to the expiration of the one-year holding period. Id., Ex. A, McGill Dep. 114-15.  Plaintiffs have pointed to no contrary evidence in the record. As to attempts to lift the stock restrictions, the shareholder represented in the record whose situation most closely resembles plaintiffs' is Michael Aiello.  Aiello sold his business to

MarineMax for a 50/50 cash-stock split.  Id., Ex. E, Aiello Dep. 32.  He and his partner

thereafter decided to sell some of their stock and requested to have the restrictions lifted.  Id. at

37.  Aiello testified that in order to sell, he simply "[s]igned some kind of letter . . . that . . .

[Kant] sent us," sent the letter back to Kant, and "we were then allowed to sell the stock."  Id. at

37-38.  Plaintiffs argue that Aiello's testimony shows that Kant assisted Aiello by sending him

the necessary documents and lifted his stock restrictions although "Aiello made no

representations, prepared no paperwork, and hired no professionals to help him."  Pls.' Opp'n

25.  This argument misrepresents the record.  In addition to Aiello's testimony, discovery

produced the opinion letter from Kant regarding Aiello's sale.  See Kant Decl., Ex. B (March 10,

2000 letter).  That letter states that Kant "examined (a) the Seller's representation letter dated

March 10, 2000, respecting the proposed sale of [47,600] shares pursuant to Rule 144 . . . ; (b) a

broker/dealer representation letter dated March 10, 2000, from . . . the Seller's broker; and (c)

the Notice of Proposed Sale of Securities on Form 144."  Id.  Plaintiffs ignore this evidence,

citing only to Aiello's testimony, in which Aiello repeatedly said that he did not remember what

happened.  See Deubert Decl., Ex. E, Aiello Dep. 39-40.  Taken as a whole, the record

demonstrates that Aiello was treated differently from plaintiffs only insofar as Kant issued an

opinion letter once Aiello and his broker sent Kant the necessary written representations, which,

as discussed above, plaintiffs did not do.  Accordingly, the record does not support the argument

that defendant in bad faith treated plaintiffs differently from other shareholders.

Finally, plaintiffs rely on Ohashi v. Verit Indus., a Ninth Circuit case involving a claim of

fraud in connection with the purchase or sale of securities in violation of the Securities Exchange

Act of 1934 § 10(b) and SEC Rule 10b-5.[21]  See 536 F.2d 849, 851 (9th Cir. 1976).  The plaintiff in Ohashi "repeatedly inquired about removal of . . . [stock] restrictions and was falsely assured by the Verit defendants that removal was imminent or that they were taking appropriate steps in that direction."  Id. at 852.  On a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Ninth Circuit sustained Ohashi's fraud cause of action based on the defendant's ongoing duty of good faith and fair dealing, implied in every contract by California law.  Id. at 851-53.  The court stated, "Although Verit did not have any express contractual duty to remove the restrictions, its cooperation was necessary to permit removal as soon as feasible."  Id.  Plaintiffs point out that Ohashi contains "[n]early identical facts" to their claim.  Pls.' Opp'n 21.  But, as noted, Ohashi is distinguishable in at least one critical respect: it was decided on a motion to dismiss.  See 536 F.2d at 854 (holding plaintiff's allegations "were enough to withstand [defendant's] motion to dismiss.").  Similarly, this court previously held that, as a matter of pleading, plaintiffs' claim of a breach of the Good Faith Efforts clause was sufficient to survive a motion to dismiss.  Op. & Order 30-35.  On summary judgment, by contrast, once defendant has met its burden of showing "that little or no evidence may be found in support of [plaintiffs'] case," Gallo, 22 F.3d at 1223-24, the burden shifts to plaintiffs to "come forward with specific facts showing that there is a genuine issue for trial," LaBounty, 137 F.3d at 73.  Ohashi does nothing to disturb the court's conclusion that plaintiffs have failed to come forward with such specific facts.

---

[21]Plaintiffs initially claimed a violation of Rule 10b-5 in their first amended complaint, but conceded that the claim was barred by the statute of limitations.  See Op. & Order 37.

The court has canvassed the entire record and found no evidence of bad faith that would support plaintiffs' breach of contract claim. The record instead is replete with undisputed evidence that any damage to plaintiffs was a result of their own decisions to forgo the private sale and to hold their stock after the one-year anniversary. No doubt plaintiffs would make different decisions with the benefit of hindsight. But the duty of good faith and fair dealing imposes no obligation on defendant to protect plaintiffs from their own financial decisions, particularly when defendant, like plaintiffs, could not know in advance whether these decisions would result in financial benefit or harm to plaintiffs. As plaintiffs have failed to come forward with specific facts to establish a genuine issue for trial in the face of the total lack of evidence of bad faith in the record, the court must enter summary judgment for defendant.

Because no breach of contract has been established, the court does not reach defendant's argument that plaintiffs have failed to prove damages.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment accordingly and close the case.


/s/_____
Allyne R. Ross
United States District Judge

Dated: August 22, 2013
      Brooklyn, New York